Marcus Daniel Merchasin, SBN 55927
Attorney and Counselor at Law
582 Market Street, Suite 1400
San Francisco, California 94104

Telephone Number: 1.415.678.2700
Facsimile Number: 1.415.520.0426
E-Mail Address: marcusmerchasin@att.net

Attorney for Defendant Glenn Guillory

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>*PLAINTIFF(S),*<br>V.<br>GLENN GUILLORY, ET AL.<br>*DEFENDANT(S).* | CASE NUMBER: 4:14-CR-00607-PJH-3<br>STATUS CONFERENCE REPORT FOR FURTHER STATUS CONFERENCE<br>Date: April 15, 2015<br>Time: 2:30 P. M.<br>Ctrm: Oakland, Ctrm. 3 – 3rd Floor<br>Judge: Hon. Phyllis J. Hamilton |

**INTRODUCTION**

This case concerns the liquidation of various parcels of foreclosed on residential real estate that were available for sale to the general public and purchased by various persons who are now specifically accused of "*bid rigging*" at the various different well attended public auctions that were conducted approximately five or more years ago on the steps of various county court houses throughout the San Francisco Bay Area. This was followed by the predictable claim of "*mail fraud*" in spite of the Defendants non - use of the mails. No lenders, auctioneers, escrow companies, title companies or ultimate re-purchasers are charged or were therefore seemingly involved in any actionable sense in this case when one would expect quite to the contrary to be true. No one was required to bid at the auctions and no one was required to buy or sell any real property. The auctioneers orchestrated all sales and handled the paperwork. All properties were offered for sale in a strictly "*as is*" condition without any guarantees, representations of fitness or warranties of habitability; there were no disclosures made by the sellers who were the foreclosing lenders and financing to purchase any of

the properties was simply not provided. Appraisals were not provided. Each of the would-be purchasers had to bring cash or certified funds before participating in the auction and/or submit proof of financial viability prior to bidding. This was strictly a "*cash and carry*" affair and each of the participants had to pre-qualify with the auctioneer. Escrows in the traditional sense were effectively non-existent. Protections normally afforded to regular prospective residential purchasers were likewise non-existent and the prospective buyers were entirely on notice of the "*caveat emptor*" nature of the proceedings. Formal inspections were generally not allowed or even called for. Routinely there was not the time or the availability of sales personnel to assist with a walk through even if requested. Satellite depictions of the real estate in question were largely unheard of at the time and that made viewing difficult, if not time consuming, assuming the putative purchasers were actually able to view the properties. With up to one hundred properties listed per auction per day and with multiple simultaneous auctions dividing the property up for sale between different auctioneers, there was often inadequate opportunity to conduct proper due diligence because of the nature of the sales, the timing of events, the limitations of the then prevailing technology and the events and personalities surrounding the sales. Lenders who made bad loans with optimistic values arbitrarily assigned to under qualified buyers used the auction process to effectively clear out their inventories of unwanted properties as opposed to cleaning up the properties themselves, listing them and conducting a traditional arms length sale to potential willing buyers, if any, to maximize the potential, if any, for profit after the resulting default. Purchasers for these distressed properties were often realtors representing independent clients or investors involved in organizing purchases for various real estate partnerships or real estate syndicates interested in "*flipping*" properties acquired at such auctions. Paperwork was filled out on the spot or nearby (such as the local McDonald's across the street from the Contra Costa County Courthouse where the auctions purportedly involving Defendant Guillory were held) and the transactions themselves were completed the same day as the auctions with funds and paperwork contemporaneously or appropriately in proximity thereto exchanging hands.

Exchanges of information, whenever made, could lead to the non-static nature of the real estate market as well as prompt changes in title to the properties sold at auction. What was thought to be a bargain could lose its appeal or visa versa. There was no formal system to correct changes in a pur-

chaser's desire to or business judgment to own real property other than to sell it. On occasion, putative buyers of real estate would simply run away from the auction purchase site without paying for the real property and this left everyone unhappy if not bemused. This could be addressed by re-auctioning the property or engaging in expensive time consuming litigation after a reasonable effort to document and then mitigate one's damages. After the purchasers paid for the property, they owned it unless they could sell it, then or later. They often had to then fix it up. The option of re-negotiation of the auction price was not available and the sale of any property to or among real estate brokers representing third party purchasers usually involved a real estate commission of some sort to be paid by someone.

Each of the defendants who are charged in this matter are alleged to have somehow participated, however innocently or minutely, in one form or another, in the investigation, research, marketing, lending, purchase, sale, discussion, rehabilitation or even resale of various pieces of real estate purchased for the sole and explicit and well publicized purpose of resale to others after the initial purchase "*as is*" at the auction, with or without rehabilitation to the properties themselves and with all risks and potential benefits that such transactions or efforts related thereto entail.

Warranties on the properties sold were not given, disclosures were not made and with that approach firmly in place there were plenty of opportunities to lose money by purchasing such a property with undisclosed mortgages, tax liens, zoning issues, structural defects, vandalism, the need for repairs, lawsuits, neighbor problems, toxic torts, surfacing or with unhappy and hostile current or former occupants or vengeful former owners bent on destruction and revenge mucking up the works. The new purchasers were left to deal with the prior owners hidden conditions as well as the potential of future owners, contractors and the properties' neighbors who were usually concerned with blighted conditions or attractive nuisances being abated.

The appointed dates for the auctions could change with little or no notice and the research tools that are now available were then largely non-existent, unheard of and/or unaffordable. The properties were sold without restrictions unless specified in the deed and the new owners were free to fix them up, occupy, sell or otherwise put the property to any good use that the new owners properly saw fit and/or when they saw fit.

On a given date and at any one time, there could be as many as three auctions going on simultaneously at the auction site with up to sixty percent of the sales being postponed for one reason or another. The identity of what was to be specifically sold at different simultaneous auctions could not be ascertained. Cross-agencies to bid on properties were not unheard of in such circumstances following the rule of reason. Insiders (usually believed to be related to the lenders) could or did on occasion buy properties before the auctions would even begin. Available inventories and opportunities changed rapidly as did the informational base surrounding each property. The persons attending the public auctions varied greatly and were not predictable. The resources available to prospective purchasers to bid on or buy a property likewise was not predictable or by any means certain at any one auction. The ability to conduct adequate meaningful due diligence on each or any of the properties that were publically listed was accordingly limited and in most instances not possible or practical.

**ADEQUATE TIME FOR THE GOVERNMENT TO DO ITS WORK**

The actual case in this matter in one form or another has been pending for approximately five months. Prior to that the parties and incidents were under active investigation for the past approximate five years. In that time period, government has had the opportunity to employ numerous FBI, treasury and other investigative agents, attorneys, experts and a variety of support personnel to help them investigate the case, gather information, cull through the evidence, formulate their claims and shape their issues. There has been plenty of time to prepare meaningful discovery and on the government's part the case should already be prepared for trial but is not.

**DISCOVERY PROBLEMS ABOUND**

In spite of this substantial head start with the use of substantial personnel well trained and adequate to the task, the production and disclosure of meaningful discovery now that we are underway remains problematic. The materials are slow in coming, dribbled in with files corrupted, not well organized, poorly labeled, duplicative and massively repetitive not to mention massive.

For example, there are approximately 1 million pages of documents. These take the form of reports, narratives, plea agreements, statements, spread sheets, lists, recordings and photographs to mention a few. The documentation itself covers a series of events that occurred in San Francisco, San Mateo, Alameda and Contra Costa Counties. The case against Defendant Guillory, however,

exclusively relates to alleged Contra Costa County property purchases alone. At least three quarters of the alleged materials so far do not appear to involve Defendant Guillory or those persons charged along side of him in this case. A fair reading of the government's protective order briefing materials argued to the Court from our last hearing seem to confirm this notion.

The discovery materials, to the extent that they were actually provided, are not necessarily organize by the events that they purportedly refer to, nor are they organized to reflect the cast of characters who are allegedly involved, nor are they organized by the specific properties sold, nor do they reflect the actual auction dates, nor do they tell a coherent story of what happened, nor do they support a claimed conspiracy and so forth and so forth. One cannot find, for example, who spoke about Defendant Guillory let alone who spoke with first hand personal knowledge. Secret identifiers are used on reports. Coding all reports in mind numbing numbers is not informative and makes the process unduly burdensome. Opinions are substituted for facts, innuendo is offered for observation and non-admissible or irrelevant information is rampantly abundant with a dearth of poignant useable and identifiable disclosure. Disjointed unidentifiable speculation is the order of the day. Reference to admissible evidence or even subject matter would be appreciated but was not provided. It even appears that government computers were promiscuously allowed to numerically number each page of each document without concern for proper order, subject matter, organization and the like.

The United States Attorney's Office – Anti –Trust Division was no doubt the recipient of this mess from various investigative agencies and passed it along. The materials that were provided were done so by the government out of "*an abundance of caution*" according to respected members of the prosecution team. Unfortunately this "*abundance of caution*" provides what appears to be 900,000 plus pages of disjointed, duplicative and garbled reading, viewing or listening materials which either in whole or in large part does not reasonably relate to the charges against Defendant Guillory or the other defendants charged in his action along with him. For most part it does not even refer to him or to them. The government appears to be providing the innuendo needed to discourage Defendant Guillory from testifying rather than providing any real evidence on its case in chief. The audio and video quality of the snooping in many cases is suspect, the duplications are burdensome and there is no outline or guide - post to get through the charges specific to Defendant Guillory. Yet Defendant

Guillory is entitled to see the specifics of what he is charged with and discover who said what about whom in a coherent organized fashion without being buried in an avalanche of paper.

The disclosure provided so far is not organized in a meaningful fashion. It requires extreme and undue effort to find appropriate references to Defendant Guillory for little to no benefit. Attempting to pair his alleged criminal activities up to his would be co-defendants is a living breathing nightmare. Defendant Guillory is charged with limited violations of the Sherman Anti - Trust Act and would like to be able to study those charges without being tasked to deal with at least 60 additional persons who allegedly plead to something and/or another 100 or so randomly showing up, all strangers, who have no relationship to Defendant Guillory, no desire to speak with him, can't remember seeing him, never met him, do not recall him, have no bearing to the specific charges involved, can't quote him and did not experience him doing any unlawful act. The factual observations cannot be identified and the morass of opinions appear to be of no interest to the court or any future jury hearing this matter. They seem to be prepared to testify against him or they would not have been disclosed. The charges against Defendant Guillory and/or his codefendants are mistakenly cloaked in the murky claim of "*conspiracy*" then are kept secret to protect the innocent. The government offers no coherent view of what and where the specific facts are that are involved with any of the disjointed discovery provided. The indexing system provided is of no help, not in a central location and the order in which the discovery is produced is randomly organized.

Defendant Guillory has not attended any of the auctions referenced in San Mateo, San Francisco or Alameda Counties nor is it claimed that he bought or sold anything in those counties. An explanation specifically indicating why it was produced or why it reasonably relates to the government's "*abundance of caution*" is necessary. Generalities are not helpful and are not meaningful. The government needs to get to the point or save us all the trouble of looking over its shoulder to see if the evidence is even fathomable. It appears that the same is true for what was actually provided to all of Defendant Guillory's alleged would be co-conspirators and co-defendants as well. What was said about them as it related to alleged criminal conduct is largely unapparent. The government has had over five years to put its case together and organize it. Yet it seemingly has not done so. Effectively offering a public telephone directory as a list of witnesses "*in an abundance of caution*" on the theo-

ry that someone might know something does not comply with *Brady v. Maryland* (1963) 373 U. S. 83, Federal Rule of Criminal Procedure 7, 12, 16 and so forth.

The defense is also critical of receiving disclosure of the government's case in bits and pieces and in a fashion designed to obfuscate the charges and make a meaningful defense or preparation therefore impossible. It makes for disjointed reading and forces massive duplicative efforts. Bad labeling, lack of centralized indexes, shuffled files and the like all aid to make the problem a real one and on a large scale.

Substantial efforts have been made to review the discovery that the government already produced. The defense has actively sought to approach both the government and the court with clean hands in offering its observations and has undertaken substantial efforts to fairly understand the government's case. The discovery was not ready to be produced when it was and it is premature to go over the jumble now with more alleged discovery pending. Even then, when for example listening to approximately 500 audio recordings of conversations involving innumerable hours of dull listening, Defendant Guillory is categorically not involved, not recorded and not referenced. A lot of needless work was needed to be able to observe that Defendant Guillory was not involved with the secret recordings. This could have been handled way better but was not and this is unacceptable.

**EXAMPLES OF SELECTED DISCOVERY PROBLEMS**

Several examples are appropriate to point out. For instance, the government has taken multipage documents [plea agreements for instance] and rather than present each agreement as a separate document, the plea agreements are divided into 15 separate documents [one document for each page]. A proper presentation and labeling of materials would have reduced the number of documents in this series of materials to one-fifteenth its current size. This amount of bloat is not a good start.

Without being unfairly critical, there are more problems. Focusing on the plea agreements to simplify the analysis, they are recorded in a TIFF electronic format. One TIFF for one page, not one document. Each TIFF has to be assembled into a complete document. When various pages in the production were found to have been corrupted,[1] the government was called and informed of the concern. The defense learned of the problem when it had sought to look at the "*images*" and/or

---

[1] This is ironic in a *corruption* case.

convert them from TIFF format to PDF format in order to organize and simplify the files into manageable identifiable documents and bookmark them. This exercise in normal basic librarianship would significantly aid in the handling, presentation and conceptualization of the materials. The government suggested that the TIFFs [particularly in the case of photographs but seemingly plea agreements as well] were originally scanned as JPEG's and that the government's conversion of the documents from JPEGs to TIFFs may have accounted for some or all of the difficulty. This office was then invited to view the documents in the original duplicate JPEG format to the extent they were provided. To the extent that there were still problems, the TIFF's and/or JPEGs could be gone over one by one. Apparently no quality check of the approximate million pages had been undertaken before turning them over. This was all *assumed* by the government and left up to the defense to catch.

If the practice of producing the very same identical documents in multiple various different formats is universal throughout the production process, then the actual turn over of files should have been less than one half to one third the volume of what it was when originally provided and one-fifteenth of that if logically organized to correspond with multipage documents. The concern over bloat is sincere. There is a lot of needless "*burdensomeness*" taking place here. The defense should not have been sent on a wild goose chase to re-examine thousands of pages in different computer formats each disclosing the same information. This case should not form the basis for another government engineered make work program. Neither the defense, government nor courts can afford it and no one should have to tolerate it.

If this were not enough, the government went on to produced various optical character recognition renditions ("O. C. R.") of the same documents that it had presumptively typed itself when it prepared them in the first place. The question of why would anyone need to optically scan a document that it already had in Microsoft Word format which it then converted and produced in other formats as well goes unanswered let alone unasked. The optical character recognition did not save the original formatting of the documents that was depicted in subsequent identical copies. The original image of the original document depicted what was already complete and wholly legible. The O. C. R. version was not orderly or useable. Multiple copies of the same identical documents merely

add to the size of the production and the scope of review required. Had the government sincerely sought to ease the defense's burden let alone its own, then the original Microsoft Word format could have been provided. There was no need for "O. C. R." Microsoft Word. The court may choose to note that a 15- page plea agreement is only one document that should be easily labeled as such in Microsoft Word and does not need fifteen separate sets of documents to be opened or closed or displayed to get to the contents of one document. In this case, each page was produced several times inflating the page count. To open and close an additional 900,000 pages separately is significant.

The repetitive use of photography is also problematic in this case and follows in the footsteps of individual typed documents. The government produced a huge page count of photographs. The first several sets of photographs that were produced had their problems. Many photographs were out of focus or targeted on extrinsic objects or people and therefore were completely irrelevant to the charges. Many photographs appeared as though the would be photographer pressed the camera trigger and kept it depressed in order to make an electronic still camera mock the results of a movie camera. Many pictures contain photographs of passersby taken in quick succession who had nothing to do with anything related to this case other than to casually walk in front of a county courthouse when federal agents were secretly photographing a public auction or people waiting for a public auction from across the street.

When audio recordings were produced they were not apparently coordinated with the still photographs that were taken nor did they relate to the video recordings that were also separately made. The voices were in many instances non-discernible but when discernible the recordings did not seem, at least so far, to relate to Defendant Guillory or his alleged would be co-defendants in this matter. Clearly, government agents spent a lot of time and effort in amassing a sea of paper, making home movies and recording selective audio. However, most of it is not linked to Defendant Guillory. The photographs, videos and audio records do not seem to identify or record Defendant Guillory's conduct for those acts for which he is specifically criminally charged. Watching strangers standing by themselves out in front of the courthouse, drinking coffee, eating sandwiches or munching on donuts is not helpful other than to show that Defendant Guillory was not present with the persons shown. Defendant Guillory would like nothing more than to be able to focus on

the materials that related to him that concern the charges filed against him. The few photographs that depict him do not seem to document what he said or did or point to actual criminal conduct that relates to actual alleged real wrongdoing undertaken by him.

The government also produced recording of various ease-dropped telephone or other recordings. The first sixty of which had nothing to do with Defendant Guillory. With a little over 400 to go, the government could provide some direction – like who was recorded or what does it have to do with Defendant Guillory. Listening to English language conversations starting with the greeting "*yo*" followed by chuckles about competitors losing money in real estate and then statements about friendship in business and loyalty in the real estate foreclosure market are not of interest nor should counsel even be subjected to it. Proper labeling is called for and proper labeling would avoid the need for separate motions in limine concerning hundreds and hundreds of waste of time recordings dealing with everything but Defendant Glenn Guillory. At best, many of these recordings demonstrate that various presumptive witnesses in fact cooperated in a generic fashion with the government and should be given the credit for that in sentencing in their separate matters. The recordings do not so far appear to relate to Defendant Guillory or any specific alleged transactions that the government is charging Defendant Guillory with.

Even the numbering "*system*" of the so-called "*evidence*" is troubling. There is no central index or central cross - referencing system. The production could have been logically *bates stamped*, the pictures and/or movies could have been dated on their face and/or labeled for ease of reference and the recordings could have been properly indexed but were not. They were not organized to correlate with other persons, documents, dates, places, activities, contents, soundtracks or exhibits. They do not even seem to relate to the concepts suggested by the charges brought in this case.

## EXAMPLE OF INCOMPLETE DISCOVERY

None of the information that has been disclosed to this date relates to the necessary financial wherewithal of any purchaser buying property through the foreclosure process. That information is relevant to the bidding history.

None of the information that has been disclosed to this date relates to the value, condition or improvements to the properties that were allegedly purchased for re-sale. None of it relates to any le-

gitimate partnership or real estate syndicate in this matter. None of it relates to limitations on re-sale of the property in question.

## NEED FOR BILL OF PARTICULARS TO FERRET OUT INFORMATION

This is an appropriate case for a *Bill of Particulars*. Until the government completes its promised forthcoming *rounds* of disclosure, a *Bill of Particulars* would seem premature.

## SUGGESTED TOPICS FOR DISCUSSION

1. *Organize Discovery*: The government really needs to organize its discovery before presenting it to the defense. A clear and simple centralized roadmap needs to be produced. This will allow a realistic analysis of whether or not all the defendants in this action should be tried together, whether discovery is complete or more needs to be done and what the relevant facts really are so that we can all focus on the real issues with the same evidence, same exhibit numbers, at the same time. It will eliminate a lot of busy work and substantially shorten any trial or case resolution efforts.

2. *Meet and Confer*: The parties need to meet and confer to get the discovery in this case under control and eliminate other issues such as any need for separation of parties for trial, setting trial dates and so forth. Number one still comes first.

3. *Bill of Particulars*: Upon completion of discovery along with presentation of a complete centralized working road map, it is anticipated that a Bill of Particulars may be appropriate to focus in on the particulars unique to each of the defendants. The concept of one - size fits all when it comes to discovery in this case does not really apply. Each of the parties are different and each of the transactions complained of are not the same. None of the Alameda, San Francisco and/or San Mateo County transactions are appropriate to this case or Defendant Guillory.

4. *Possible Pre - Plea Diversion*: The concept of pre - plea diversion needs to be explored.

5. *Motions to Dismiss*: This case may be appropriate, once discovery is complete, for one or more Rule 12 motions.

6. *Setting Trial Dates*: Until discovery is satisfactorily addressed, it is premature to set a trial date. Another status conference would seem appropriate. If this is not suitable and discovery remains problematic, then a discussion of timing, time waivers, joinder of parties and prejudice is appropriate.

Notwithstanding any and/or all of the above, all rights are reserved.

Dated: 04 | 06 | 15

Marcus Daniel Merchasin
Attorney at Law