UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JOHN MICHAEL GALLOWAY,<br>NICHOLAS DIAZ,<br>GLENN GUILLORY, and<br>THOMAS JOYCE,<br>Defendants. | Case No. CR 14-607 PJH<br>**PRETRIAL ORDER NO. 1**<br>Doc. Nos. 103, 104, 105, 106 |

This matter came on for hearing on July 27, 2016, on the pretrial motions of defendants John Michael Galloway, Nicholas Diaz, Glenn Guillory, and Thomas Joyce. The court granted leave for the parties to file post-hearing briefs on the motion to dismiss the mail fraud counts, or, in the alternative, to strike the omissions theory. Having reviewed the relevant legal authority, the parties' papers, argument of counsel, and evidence in the record, the court rules as follows:

## I. Motion to Dismiss Mail Fraud Counts or, in the Alternative, to Strike the Omissions Theory

Defendants raise a number of challenges to the mail fraud counts, but the oral argument and the post-hearing briefing refine the argument to three distinct challenges: (1) failure to allege an actionable omission; (2) failure to incorporate the bid-rigging allegations of count one into the mail fraud counts; and (3) failure to allege how any misstatement made after the winning bid was accepted at the public auction was material. Doc. no. 105. The motion is GRANTED on the first two grounds: the omissions

United States District Court
Northern District of California

theory of fraud is STRICKEN, and the mail fraud counts are DISMISSED. Because the mail fraud counts are dismissed, the court does not reach the separate arguments related to materiality.

**A. Concealment Theory**

As a preliminary matter, defendants contend that the mail fraud counts of the indictment fail to identify any false statement or misrepresentation that would support a violation of the mail fraud statute, 18 U.S.C. § 1341. Defendants read the mail fraud statute to require the government to prove more than a general pattern of deceptive conduct to establish a scheme to defraud, arguing that the government must prove that specific false statements or misrepresentations were made to further a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Citing *Loughrin v. United States*, 134 S. Ct. 2382 (2014), where the Court held that the two phrases of the mail fraud statute define a single offense, not two separate offenses, defendants argue that the first statutory phrase, "scheme or artifice to defraud," states no elements apart from the second phrase "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Defendants argue that unless the "scheme to defraud" is read with the second phrase to require a false statement or misrepresentation, it cannot satisfy the materiality requirement recognized in *U.S. v. Woods,* 335 F.3d 993 (9th Cir. 2003).

The government disputes defendants' contention that a scheme to defraud requires a finding of a specific false statement, and argues that the government may prove a scheme to defraud with evidence of an overall scheme of deceit or chicanery. Opp. to Mot. Dismiss Mail Fraud (doc. no. 116) at 6-8. In *Woods,* the Ninth Circuit recognized that a scheme to defraud may be found even if no single fact is misrepresented, where the "arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance." 335 F.3d at 998. Defendants contend that the holding of *Woods* that a scheme to defraud can be proven

by a pattern of deceptive conduct, even if no single fact is misrepresented, has been overruled by *Loughrin,* which they contend requires the government to prove a specific false statement or specific omission to establish a scheme to defraud. Doc. no. 105 at 6-7. Defendants cite no authority in support of that contention, and *Loughrin* did not hold that a specific false misstatement or misrepresentation was required to prove a scheme to defraud.

In response to the court's question about the conjunctive language of the mail fraud counts, which alleges "a scheme and artifice to defraud beneficiaries **and** to obtain money and property from beneficiaries by means of materially false and fraudulent pretenses," the government clarified that under its theory of the case, it will prove **either** a scheme to defraud, based on false statements or a general pattern of deceit, **or** a scheme to obtain money and property by means of false statements or pretenses. Jul. 27, 2016 Transcript ("Tr.") at 13. This theory is consistent with Ninth Circuit Model Criminal Jury Instruction 8.121 on mail fraud ("In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole."), and the accompanying comment, which cites *Woods*. *See also U.S. v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005) ("In *Woods*, we held that proof of a scheme or artifice to defraud does not require the proof of the making of any specific false statement."). For purposes of this motion, the government argues that the indictment provides sufficient information about the "false and misleading statements that trustees relied upon to distribute proceeds to beneficiaries and to convey title to selected properties." Doc. no. 116 at 9 (citing Indictment ¶¶ 16-18). The government contends that the indictment "alleges that defendants actively concealed their anticompetitive conduct" to support a concealment theory of fraud. Doc. no. 116 at 11. The court proceeds to determine the sufficiency of the allegations of the false and misleading statements under the concealment theory.

Mail and wire fraud can be premised on either a non-disclosure or an affirmative misrepresentation. *See U.S. v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986). A non-

disclosure, however, can support a fraud charge only "when there exists an independent duty that has been breached by the person so charged." *U.S. v. Dowling*, 739 F.2d 1445, 1449 (9th Cir.1984), *rev'd on other grounds*, 473 U.S. 207 (1985). The government does not dispute that a fraud charge supported by omission or non-disclosure requires a duty to disclose, and conceded at the hearing that its concealment theory is not based on any duty to disclose, including a duty to disclose the Sherman Act violations. Tr. at 26, 29-30. The government argues that defendants not only omitted relevant information, but affirmatively misrepresented facts on the receipts of funds by misstating the purchase price of the property, which did not reflect the final amount agreed upon at the rounds; by misrepresenting that a person who took title to the property, but did not win the public auction, was the winner at public auction, if that was listed on the receipt of funds; by misrepresenting that the winner at the public auction and the winner at the second private auction, or round, were co-buyers when actually only one person took title to the property; and by misrepresenting that an investor was an auction participant when, in fact, he was not. *See also* Opp. to Mot. Bill of Particulars (doc. no. 109) at 11 ("The government's false and fraudulent pretenses theory is that the defendants caused false statements to be made to the trustees by providing false information on the auction paperwork, particularly the receipt of funds ("ROF").). The government urges that these alleged statements are not omissions, but affirmative misrepresentations which do not require a duty to disclose. Tr. at 28-30.

Defendants argue that none of these alleged misrepresentations could support a finding of mail fraud without proof that defendants had a duty to disclose the underlying facts. Defendants pose a hypothetical situation in which an attendee at a foreclosure auction approaches the winning bidder who purchased the property, without any prior agreement, and informs the winning bidder that she had refrained from bidding at the public auction because she did not want to engage in a public bidding war that could have inflated the price, but now wishes to purchase the property from the winning bidder and offers to pay the winning bidder $5000.00 over the winning bid. If this offer is

accepted in such a case, defendants contend that no crime has been committed, and there is no fraud, even if the additional $5000.00 payment is not disclosed and/or the auctioneer is asked to modify the identity of the auction winner. In the context of the charges of the indictment, defendants argue that only the allegations of an underlying bid-rigging conspiracy would raise a question of the legality of subsequent payments between auction participants and alterations of paperwork, but that the government failed to incorporate the bid-rigging allegations in the mail fraud scheme.

Addressing first the question whether the indictment sufficiently alleges a mail fraud scheme under a concealment theory not requiring a duty to disclose, the government contends that by misrepresenting the purchase price and the identity of the buyer at the public auction, defendants affirmatively made deceitful and misleading statements designed to conceal the rounds and the payoffs, citing authorities distinguishing concealment from mere silence. Doc. no. 116. The indictment alleges, in the means and methods section of the mail fraud counts, that defendants carried out the scheme to defraud, in part, by "making and causing to be made materially false and misleading statements that trustees relied upon to distribute proceeds to beneficiaries and to convey title to selected properties" and by "concealing rounds and payoffs from trustees and beneficiaries." Indictment ¶ 18b, d. At oral argument, the government clarified that under its concealment theory, the false and misleading statements that were made as part of the scheme "were made on the receipts of funds. Those statements were concealed. This false pretense created the transfer of title as part of that property." Tr. at 22.

Upon close consideration of the allegations and the government's theory of the case, the court finds no meaningful distinction between "omission," "non-disclosure," and "concealment" of the fact that defendants conducted rounds and payoffs, in the absence of any duty to disclose that fact to the trustees or beneficiaries. In *U.S. v. Colton*, 231 F.3d 890, 902–03 (4th Cir. 2000), cited by the government in support of its alternative fraud theory of a general pattern of deceit, doc. no. 116 at 6-7, the Fourth Circuit

recognized the "close relationship between nondisclosure and concealment." In *Dowling*, the Ninth Circuit used the terms **non-disclosure** and **concealment** interchangeably "as a basis for the fraudulent scheme." 739 F.2d at 1448. Even the dictionary definitions do not reveal a meaningful distinction among the terms **omission** ("non-performance or neglect of an action which one has a moral duty or legal obligation to perform"), **non-disclosure** ("failure to reveal or disclose information") and **concealment** ("crime of concealing or suppressing information so as to cause injury or disadvantage to another").

Here, while the government labels its theory of the mail fraud counts as "concealment," rather than "omission," the allegations that defendants misrepresented the buyer's identity and auction price to conceal the post-auction rounds and payoffs are necessarily predicated on an obligation to disclose the fact that they held secondary rounds and the results of that process. As the defense has illustrated by the hypothetical involving a post-auction agreement for the winning bidder to exchange cash for the right to take title to the property, the hypothetical parties would have no obligation to disclose their arrangement to the trustees conducting the foreclosure sale. The government has not argued that there is a statutory duty or other legal obligation to report the post-auction agreement price on the receipt of funds, when the winning bidder successfully won the auction with the reported bid price, or that there is a duty to report that a person other than the winning bidder would take title to the property. In other words, the government charges defendants with mail fraud based on a theory that they concealed facts that they had no obligation to disclose.

Here, the government characterizes as an act of active concealment or misrepresentation the statement on the receipt of funds listing the purchase price as the amount of winning bid at the public auction, rather than the purchase price that defendants privately agreed upon at the secondary round. Characterizing the winning public auction bid as a misstatement of the "true purchase price of the auction," Tr. at 26, which defendants determined after the public bidding had closed, assumes that

defendants were obligated to report their post-auction purchase agreement to the trustees, but the government has offered no basis for that assumption.

Similarly, the government does not articulate an obligation to list the "buyer" on the receipt of funds as the winner of the secondary round rather than the winning bidder at the public auction. Although one would expect that the buyer listed on the receipt of funds would be the winning bidder of the public auction, it is not clear from the receipt of funds form that the trustee requires the identity of the winning bidder as the "buyer," if a different person tendered the total bid amount and took title to the property. On its face, the receipt of funds form requires a statement of the "Amount of Total Bid," and "Buyer's Information," with no requirement to attest that the "Buyer" is the same person who won the bid. Decl. of Alexis Loeb ISO Opp. Mot. Bill of Particulars (doc. no. 110), Ex. N (under seal). Although the statement identifying the winner of the secondary round as the "buyer" presents a closer question of falsity and concealment than the statement of the total bid amount, the allegations of the indictment, in light of the facts and arguments developed in the record, do not support a concealment theory of fraud without alleging a predicate duty or obligation to report the winner of the public auction as the "buyer."

The government fails to identify a legal duty to report the winning public auction bidder as the "Buyer" or the privately negotiated purchase price as the "Amount of Total Bid" on the receipt of funds. In the absence of such a duty, the allegations charging defendants with "making and causing to be made materially false and misleading statements that trustees relied upon to distribute proceeds to beneficiaries and to convey title to selected properties," ¶ 18b, and "concealing rounds and payoffs from trustees and beneficiaries" among the means and methods of the mail fraud scheme, ¶ 18d, are STRICKEN from the indictment.

//

//

United States District Court
Northern District of California

**B. Failure to Incorporate Bid-Rigging Allegations**

Defendants raise a novel challenge to the mail fraud counts that has not been expressly raised by the defense in related bid-rigging cases:[1] the indictment fails to incorporate the bid-rigging allegations, ¶¶ 7-14, into the mail fraud counts, ¶¶ 15-20. The government concedes that the mail fraud counts do not incorporate the bid-rigging allegations by reference, but argues that the mail fraud counts do not depend solely on the concealment of bid-rigging. At the same time, the government acknowledges that the mail fraud allegations "allege facts that indicate bid-rigging," as confirmed by the language of both the bid-rigging and mail fraud allegations which use common terms such as "rounds," "suppressed prices," and "selected properties." Doc. no. 137.

An indictment is sufficient if it contains a description of the charges against the defendant sufficient to (1) enable him to prepare his defense; (2) ensure him that he is being prosecuted on the basis of facts presented to the grand jury; (3) enable him to plead double jeopardy against a later prosecution; and (4) inform the court of the facts alleged so that it can determine the sufficiency of the charge. *U.S. v. Bohonus*, 628 F.2d 1167, 1173 (9th Cir. 1980) (citations omitted). "The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" *U.S. v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (quoting *U.S. v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000)). "'An indictment must be read in its entirety and construed in accord with common sense and practicality.'" *U.S. v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015) (quoting *U.S. v. Alber*, 56 F.3d 1106, 1111 (9th Cir. 1995)).

Defendants rely on Ninth Circuit authority, first cited in the government's surreply, recognizing as "long-standing law that each count charged against a defendant must stand on its own." *U.S. v. Rodriguez–Gonzales*, 358 F.3d 1156, 1159 (9th Cir. 2004).

---

[1] The indictments in *United States v. Marr*, CR 14-580 PJH and *United States v. Florida,* CR 14-582 PJH, are identical to the indictment here in failing to incorporate the allegations of bid-rigging into the mail fraud counts.

This principle was articulated in *Dunn v. United States*, 284 U.S. 390, 393 (1932) ("Each count in an indictment is regarded as if it was a separate indictment.") (citing *Selvester v. United States*, 170 U.S. 262, 267 (1898)). "Accordingly, it has been held that each count in an indictment must stand on its own, and cannot base its validity on the allegations of any other count not specifically incorporated." *U.S. v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991) (citing *U.S. v. Olatunji*, 872 F.2d 1161, 1166 (3d Cir. 1989); *U.S. v. Winter*, 663 F.2d 1120, 1138 (1st Cir. 1981), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997); *U.S. v. Fulcher*, 626 F.2d 985, 988 (D.C. Cir. 1980)). This principle remains controlling law and stands in tension with the principle that when evaluated for legal sufficiency, "[t]he indictment should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *U.S. v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985). Based on the record developed in this case, the court resolves the conflict in favor of defendants, who have demonstrated that without reference to the bid-rigging allegations and the predicate agreement not to compete, the mail fraud allegations do not sufficiently allege illegal conduct to support a fraudulent scheme, whether under the theory of a pattern of deceitful behavior or the concealment theory of making false statements and misrepresentations, which is stricken on separate grounds.

Having heard extensive argument and reviewed supplemental briefing on the issue, the court determines that the government has taken internally inconsistent positions that the mail fraud counts stand alone, without reference to the bid-rigging allegations, yet the indictment should be read as a whole to find a scheme to defraud based, at least in part, on the bid-rigging allegations. At oral argument, the government articulated that what constituted the fraud "was the second auction process where they determined who was really going to get the property and who was really the real winner and the real amount." Tr. at 50. As posed by the government, "defendants do not need to have concealed an anticompetitive agreement to have committed fraud," yet the mail fraud allegations are inextricably intertwined with the bid-rigging allegations. *See* doc.

no. 137 at 4. Furthermore, the allegations supporting the concealment theory of fraud based on false statements on the receipts of funds, which the government contends do not necessarily rely on the anticompetitive agreement, are now stricken for lack of a duty to disclose, leaving only the bid-rigging-related means and methods of the scheme to defraud. *Id.* Without the allegations of making materially false and misleading statements and concealing rounds and payoffs, the indictment details the fraudulent scheme to include "holding second, private auctions, known as 'rounds,' to determine payoff amounts and the schemers who would be awarded the selected properties; paying co-schemers monies that otherwise would have gone to beneficiaries; . . . and causing the suppressed purchase prices to be reported and paid to beneficiaries." Indictment ¶ 18a, c, e.

The government urges the court to apply a commonsense interpretation of bid-rigging related terms that are alleged in the mail fraud counts, citing Ninth Circuit authority that when the indictment is read in its entirety and construed according to common sense, the allegations of one count may be read together with another count. *U.S. v. Thomas*, 893 F.2d 1066, 1070 (9th Cir. 1990). While the court recognizes that the terms may be construed in light of the entirety of the indictment, the court discerns that the mail fraud counts suffer from a structural deficiency, which is distinct from determining whether the indictment sets forth all the elements necessary to constitute the offense. Moreover, contrary to the government's arguments, this deficiency does not amount to a challenge of the strength of the evidence, which is "irrelevant to the sufficiency of the indictment." *U.S. v. Buckley*, 689 F.2d 893, 900 (9th Cir. 1982). In *U.S. v. Zavala*, 839 F.2d 523 (9th Cir. 1988) (per curiam), the court rejected the defendant's vagueness challenge to the counts alleging unlawful use of a telephone to facilitate charged drug offenses where the prohibited drug was not identified and the telephone counts did not specifically refer to the conspiracy count which specified conspiracy to import cocaine. The court in *Zavala* found "this is a defect of form, not substance," but declined to consider this challenge to the indictment as raised for the first time on appeal. *Id.* at 526.

Here, defendants have squarely identified the structural deficiency of the mail fraud counts, which the government concedes are based in part on concealment of the alleged bid-rigging but does not incorporate those bid-rigging allegations. Tr. at 25. The bid-rigging allegations in ¶¶ 7-14 were clearly omitted from the mail fraud counts on purpose, as reflected by the fact that the background facts in paragraphs 1-6 were specifically incorporated by reference in the mail fraud counts. The defendants speculate as to the reason for the government's charging strategy, but the court fails to see how the government's motive impacts the motion to dismiss. Pending before this court are three indictments charging 14 defendants with bid-rigging and mail fraud, none of which incorporate the bid-rigging allegations into the mail fraud counts. Also pending are other related cases in which 37 indictments or informations charge individual defendants with bid-rigging and some additionally with conspiracy to commit mail fraud. In some of the conspiracy to commit mail fraud charges, the bid rigging allegations are expressly incorporated, in some they are incorporated by reference, and in some they are omitted. The court need not speculate as to the government's strategy for drafting the pleadings as it has chosen to do. What has now become clear to the court is that the mail fraud counts in this and the two related indictments in *Marr* and *Florida* do not stand alone without reference to the bid-rigging allegations. To look at it another way, if defendants were acquitted of bid-rigging, it does not appear to the court that they could be convicted of mail fraud under the government's theory of the case.

Accordingly, Counts Two through Nine of the indictment are DISMISSED.

## II. Motion for Bill of Particulars

With respect to the remaining count of the indictment, alleging a Sherman Act violation, defendants' motion for a bill of particulars is DENIED, in light of the discovery produced by the government and the substantial briefing and argument articulating its theory of the bid-rigging conspiracy. Doc. no. 104. Defendants seek specific categories of detailed evidence which is not required of a bill of particulars. *U.S. v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985); *U.S. v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) ("there

United States District Court
Northern District of California

is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy"). Given the court's familiarity with the voluminous discovery produced in this case and defendants' concern about being able to prepare for trial more effectively and efficiently, IT IS ORDERED that the government shall disclose its trial exhibit list and witness list by **November 23, 2016**. As previously ordered by the court, the government must file its notice of coconspirator statements by **November 9, 2016**; the parties shall file pretrial statements, motions in limine, proposed jury instructions, and a proposed form of verdict by **November 23, 2016**; and responses to the motions in limine must be filed by **December 7, 2016.**

## III. Motion to Adjudicate Sherman Act Count Pursuant to Rule of Reason

Defendants' motion to adjudicate the Sherman Act count pursuant to the rule of reason is DENIED. Doc. no. 106. The indictment charges defendants with a conspiracy involving an agreement not to compete at public foreclosure auctions, designating which conspirator would win selected properties at the public auction, and holding secondary private auctions to determine the conspirator who would be awarded the selected properties and to determine the payoff amounts for those agreeing not to compete. This type of conduct falls squarely within the per se category of bid-rigging, which is widely recognized as a form of price-fixing, which is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958).

Defendants cite *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154-55 (9th Cir. 2003), where the court noted that it was appropriate to apply the rule of reason "because plausible arguments that a practice is procompetitive make us unable to conclude 'the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.'" *Id.* at 1155 n.8 (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 294 (1985)). Neither *Paladin* nor *Northwest Wholesale Stationers* (both civil cases involving private litigants) involved an anticompetitive agreement that fell squarely within a per se

United States District Court
Northern District of California

category, and neither case stands for the proposition that defendants may offer plausible arguments in support of a rule of reason analysis to a category of economic activity that merits per se invalidation under Section 1 of the Sherman Act. *See Northwest Wholesale Stationers,* 472 U.S. at 293, 295-96 (distinguishing the wholesale cooperative at issue from group boycotts subject to per se treatment, where the case "turns on . . . whether the decision to expel Pacific is properly viewed as a group boycott or concerted refusal to deal mandating per se invalidation"); *Paladin,* 328 F.3d at 1154-55 ("even if Northridge and MPC are, in a sense, competitors, the type of agreement at issue here cannot be considered one that will 'always or almost always tend to restrict competition.'") (quoting *Northwest Wholesale Stationers*, 472 U.S. at 289). The court declines defendants' invitation to carve out an exception from the per se rule that applies to bid-rigging simply because it took place during a recession or in the wake of a housing bubble, given the weight of authority recognizing bid-rigging as a category of anticompetitive conduct subject to per se treatment. *U.S. v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010) (affirming CR 05-208 WHA (N.D. Cal.)); *U.S. v. Romer*, 148 F.3d 359 (4th Cir. 1998); *U.S. v. Koppers Co., Inc.*, 652 F.2d 290, 295 (2d Cir. 1981).

By contrast to *Paladin* and *Northwest Wholesale Stationers*, where the courts considered whether the alleged conduct fit into the per se category of group boycotts, an alleged agreement not to compete at a public auction, to designate the winner at the public auction, and to negotiate payoffs for agreeing not to compete is the kind of agreement that courts have deemed to be unlawful under Section 1 of the Sherman Act, as recognized by the antitrust bar:

> The indictment charges the defendants with conspiring to rig the results of an auction. An auction-rigging conspiracy is an agreement between two or more persons to eliminate, reduce or interfere with competition for a product, job or contract that is to be awarded on the basis of auction bids. In this case, defendants have been charged with conspiring to rig the results of the [auction title or description] by deciding in advance which of them should be the successful bidder on particular items.

ABA MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 62-63 (2009)). As the government points out, the per se rule has been consistently applied in prosecutions for bid-rigging in the context of public foreclosure auctions, though admittedly the defendants in those cases did not litigate the application of the per se rule. *U.S. v. Romer*, 148 F.3d 359 (4th Cir. 1998); *U.S. v. Guthrie*, 814 F. Supp. 942 (E.D. Wash. 1993), *aff'd*, 17 F.3d 397 (9th Cir. 1994) (unpublished); *U.S. v. Katakis*, CR 11-511 WBS (E.D. Cal. March 11, 2014).

Even if the reasoning of *Paladin* could be extended to a per se bid-rigging prosecution, the court is not persuaded that defendants have offered "plausible arguments" about the procompetitive effects of their agreement that would warrant analysis under the rule of reason. Defendants argue that they were competing in a unique market, where the banks effectively dominated the market for foreclosed properties and set their own price as buyers by determining the opening bid as sellers at the public auction. This "unique position" of the banks is not unique to the time period charged in the indictment. As recognized by the consultant to the defendants in *U.S. v. Marr,* CR 14-580 PJH, cited by defendants here, "In public foreclosure auctions, the mortgage holder sets the opening bid amount. . . . If a third party does not bid higher than the opening bid, then the bank retains the property and is able to resell it in the open market." Andrien Decl. (doc. no. 106-2) ¶ 16. The fact that defendants are charged with an agreement not to compete during a time when there was a glut of foreclosures does not render their anticompetitive agreement subject to a "plausible argument" that their arrangement was "intended to enhance overall efficiency and make markets more competitive." *Northwest Wholesale Stationers,* 472 U.S. at 294, 296 (recognizing that wholesale purchasing cooperatives "are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects" and that "[t]he act of expulsion from a wholesale cooperative does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect").

United States District Court
Northern District of California

Defendants have not demonstrated that the housing foreclosure market was exceptional in any way other than the volume of properties available, or that defendants were precluded from competing in the open market. *See U.S. v. Alston*, 974 F.2d 1206, 1209 (9th Cir. 1992) (rejecting argument that that the agreement among dentists on higher co-payment fees to be paid by prepaid dental plans should have been analyzed under the rule of reason, holding that the health care market was not an exceptional market in which horizontal restraints on competition were necessary to make the product available on the market at all). Defendants were not prevented from entering the market without an agreement not to compete; defendants could have openly competed in the public foreclosure auctions against the banks and other competitors, including co-conspirators. The Sherman Act violation charged in the indictment alleges an agreement among competitors not to compete against each other at auction, a bid-rigging arrangement mandating per se treatment because "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Northwest Wholesale Stationers*, 472 U.S. at 294. "This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pac. Ry.*, 356 U.S. at 5.

**IV. Motion to Suppress**

Defendants' motion to suppress warrantless audio recordings is DENIED. Doc. no. 103. Defense counsel conceded at the hearing that the motion to suppress was limited to the audio recordings, and did not seek suppression of the video recordings. Tr. at 6. Defendants adopt verbatim the arguments of the suppression motion filed in *Marr* (CR 14-580 PJH), which the court considered with the benefit of the arguments presented by the defendants in the related *Florida* (CR 14-582 PJH) case. The court

thoroughly discussed the merits of those arguments in the orders denying the motions in both of those cases, and proceeds to issue a more summary ruling in denying the instant motion. Here, as in *Marr* and *Florida*, the court denies the motion to suppress on the ground that defendants have not met their burden under Fourth Amendment principles to show a legitimate expectation of privacy in the conversations that were recorded.

**A. Standing**

As an initial matter, the government contends that defendants lack standing to challenge all the stationary recordings under either the Fourth Amendment or under Title III, which only allows an “aggrieved person” to move to suppress wiretap evidence. Opp. Mot. Suppr. Recordings (doc. no. 112) at 3-4 (citing *Rakas v. Illinois*, 439 U.S. 128 (1978) and 18 U.S.C. § 2518(10(a)). *See* 18 U.S.C. § 2510(11) (an “aggrieved person” means a person “who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed.”). Defendants Nicholas Diaz and Thomas Joyce each filed a declaration stating that while he attended foreclosure auctions at the Alameda County courthouse in Oakland and/or the Contra Costa County courthouse in Martinez, he engaged in conversations that he believed and expected to be private and confidential. Doc. nos. 103-3, 107. Joyce’s attorney conceded at the hearing, however, that Joyce’s voice was not identified on any of the recordings. Similarly, counsel for Guillory conceded that Guillory was not identified on the recordings.

Although defendants do not dispute the government’s representation that Guillory and Joyce’s conversations were not recorded with the stationary devices, they argue generally that they were identified as a subject of the investigation. Doc. no. 125 at 2. Defendants cite no authority broadly construing “a person against whom the interception was directed” to include someone who was under surveillance but had no communications intercepted, was not an owner of the premises where the warrantless interceptions were made, and was not named in a wiretap application. *See U.S. v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (holding that the defendant was one of the individuals “against whom the interception was directed,” even though his voice was not verified to

be on any of the recordings, where the affidavits in support of the surveillance orders included investigators' statements certifying their beliefs that he was using the individual cellular phones at issue, showing that the defendant's conversations were the target of the surveillance); *U.S. v. King*, 478 F.2d 494, 506 (9th Cir. 1973) ("a defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises"). *Id*.

In *Alderman v. United States*, 394 U.S. 165, 171-72 (1969), the Supreme Court rejected an expansive view of Fourth Amendment standing urged by the defendants there who argued that "if evidence is inadmissible against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissible against his codefendant or coconspirator." The Supreme Court recognized that "[t]he established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing." *Id*. The Ninth Circuit has held that standing under the wiretap statute is not broader than Fourth Amendment standing. *See U.S. v. Gonzalez, Inc.,* 412 F.3d 1102, 1116 (2005) ("[t]he Supreme Court has interpreted these provisions as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were violated by the interception"), *amended by* 437 F.3d 854 (9th Cir. 2006). "Both the language of the statute and its legislative history make it clear that it does not broaden the rule of standing provided for in [former] Rule 41(e), F.R.Crim.P., relating to Fourth Amendment motions to suppress." *King*, 478 F.2d at 506 (citing 18 U.S.C. § 2510(11); S. Rep. No. 1097, 90th Cong. 2d Sess., quoted in 1968 U.S. Code Cong. & Admin. News at 2179). In the absence of authority broadly recognizing that a defendant who was under investigation, but was neither intercepted nor named in a wiretap application, qualifies as an "aggrieved person"

United States District Court
Northern District of California

under the wiretap statute, the court finds that Guillory and Joyce have not demonstrated that they have standing to challenge the warrantless audio recordings.

The government concedes that both Galloway and Diaz were captured on three recordings and that they would have standing to challenge those recordings. The government has identified two recordings capturing Diaz in front of the Contra Costa County Finance Building, across the street from the Contra Costa County Courthouse. Having identified specific recordings of his conversations in the record, Diaz has demonstrated standing under the Fourth Amendment and the wiretap statute to challenge those recordings. Galloway withdrew his joinder in this motion, leaving Diaz as the only moving party. Under the weight of authority discussed here, Diaz's Fourth Amendment standing is limited to challenging the interception of conversations in which he participated.

**B. Expectation of Privacy**

Diaz contends that he had a reasonable expectation of privacy in his communications outside the courthouse, citing cases recognizing a privacy right in communications made in a public place. None of the cases are directly on point, and none acknowledge that a zone of privacy exists at or near a courthouse entrance.

The government admits that in the course of the bid-rigging investigation, the FBI installed stationary microphones in public spaces in the vicinity of the public auctions outside the Contra Costa County courthouse located at 725 Court Street in Martinez, from June 2010 to December 2010. Wynar Decl. (doc. no. 112-1) ¶¶ 5-7. The government has provided no explanation or justification for why prior judicial authorization was not sought before installation of the microphones. Instead, it argues only that defendants had no reasonable expectation of privacy.

The warrantless recordings of Diaz were recorded on microphones located in a vehicle parked near the Contra Costa County Finance Building, located at 625 Court Street in Martinez, and along a staircase off the sidewalk leading to the Finance Building. Sambat Decl. (doc. no. 112-10) Exs. 1 and 2, 1D517.001 avi and 1D619.001_part1.wav.

United States District Court
Northern District of California

The Court Street sidewalk leading to this staircase is near the intersection of Court Street and Main Street, which the court notes is located across the street from the Contra Costa County courthouse. Wynar Decl. ¶¶ 5-7.

The government contends that Diaz did not have a reasonable expectation of privacy in his public oral communications outside the county courthouse, challenging both his subjective expectation of privacy and the reasonableness of that expectation. The parties agree that to determine whether an individual can demonstrate a reasonable expectation of privacy, the court weighs the factors set forth in *Kee v. City of Rowlett*, 247 F.3d 206, 213-15 (5th Cir. 2001)):

> (1) the volume of the communication or conversation;
>
> (2) the proximity or potential of other individuals to overhear the conversation;
>
> (3) the potential for communications to be reported;
>
> (4) the affirmative actions taken by the speakers to shield their privacy;
>
> (5) the need for technological enhancements to hear the communications; and
>
> (6) the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating.

*See Reynolds v. City and County of San Francisco*, 2012 WL 1143830 at *5 (N.D. Cal. Mar. 30, 2012) (citing *Kee*).

**1. Subjective Expectation of Privacy**

In his declaration, Diaz states his belief that many of his conversations before, during and after the auctions at or near the courthouse steps were private, and that he took measures to ensure privacy by moving away from a larger group of people, standing close to the person with whom he was speaking, ceasing conversation when others approached, speaking out of earshot of other people, or speaking quietly or whispering. Diaz Decl. ¶ 7. There are no facts in the record to substantiate his subjective beliefs with respect to the specifically identified conversations, though Diaz is not expected to

United States District Court
Northern District of California

remember the detailed circumstances of each recorded conversation, since the recordings were made without his knowledge over five years ago. Diaz argues that his subjective expectation that his conversations would remain private was reasonable, even in a public place such as a courthouse entrance, given the personal nature of conversations that people often carry in hushed tones as they enter or leave the courthouse.

The evidence in the record, including video accompanying one of the audio recordings of the intercepted communications, suggests that Diaz communicated near the courthouse entrance openly with several people at a time. Sambat Decl. Ex. B, 1D517.001.avi (under seal) (showing 4 or 5 men sitting on a staircase). The record of the bid-rigging investigation at the Contra Costa County courthouse reflects that rounds were conducted in public areas, sometimes with a large group of secondary bidders.

These circumstances do not demonstrate a subjective expectation of privacy, even in light of Diaz's conclusory statements that he believed his conversations were private. In having these conversations, the "rounders" did not leave the vicinity of the public auctions, which were held outside the courthouse just prior to the secondary auction. The auctioneer would typically position himself at the top of the steps or midway on the landing of the steps of the courthouses to conduct the public auctions, which were held every weekday at 10:00 am and 1:30 pm at the Contra Costa County courthouse. Wynar Decl. ¶ 9. Other than Diaz's own conclusory statements, there are no reliable facts in the record to support a finding that he had a subjective expectation of privacy in the group conversations at issue.

**2. Reasonableness**

However, even assuming the validity of Diaz's subjective expectations, the *Kee* factors render those expectations objectively unreasonable, particularly the factors: proximity or potential of other individuals to overhear the conversation, potential for communications to be reported, and location of the communications, as it relates to their subjective expectations. Having listened to the recordings at issue, the court finds that

Diaz did not take steps to protect the privacy of the conversations that were audibly recorded.

**a. The volume of the communication or conversation**

The two recordings at issue intercepted communications that were made at a normal conversational volume level, not in hushed or whispering tones. Both of the recordings picked up background noise, such as automotive traffic and other conversations from people nearby, which often drowned out the conversations on the recording. In the video footage accompanying one of the audio recordings, the participants are not seen appearing to whisper or covering their mouths when having audible conversations that can be heard on the recording. Sambat Decl. Ex. B, 1D517.001.avi. In listening to the audio recordings, the court observed that when a person was speaking at a lowered volume, the recorded communications were not audible or intelligible. The audible conversations that were recorded were loud enough to be heard by anyone passing by, undermining the reasonableness of any subjective expectation of privacy.

**b. The proximity or potential of other individuals to overhear the conversation**

The fact that the conversations were conducted in open, public areas close to the courthouse entrance, where the public auctions had just been held, and where various members of the public, including law enforcement officers and attorneys, come and go, does not support a reasonable expectation of privacy under the second *Kee* factor. Diaz suggests that private affairs are routinely discussed outside courthouses, including attorney-client communications. Mot. Suppress (doc. no. 103) at 3. It is unlikely, and certainly unreasonable, for attorneys to risk breaching their confidential communications with clients by discussing sensitive matters out in the open, in conversational tones, in front of a public forum such as a courthouse, where they could easily be overheard by other attorneys, prosecutors, law enforcement officers, security personnel, court staff, judges, and other bystanders.

**c. The potential for communications to be reported**

As noted above, Diaz conducted the intercepted conversations near a courthouse entrance, where the public foreclosure auction was daily held and where members of the bar and law enforcement officers routinely traversed, exposing them to a high likelihood of being observed and reported. Furthermore, the recorded conversations were conducted with multiple participants, any of whom could have reported the bid-rigging activity. *See Hoffa v. United States*, 385 U.S. 293, 303 (1966) ("The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society.") (citation and internal marks omitted).

**d. Affirmative actions taken by the speakers to shield their privacy**

Diaz suggests that he can be seen in the accompanying video moving away from others to conduct a conversation and moving away from the street toward the building for discussion, to protect his privacy. Reply (doc. no. 125) at 3. Having listened to the recordings at issue, one of which was accompanied by video images, the court determines that when a speaker moved away, or appeared to speak in hushed tones, the communication was not audibly intercepted by the recording device. Based on the recorded communications that are audible or intelligible, it is clear that the participants did not take measures to keep their conversations private. Unlike *Katz*, where the defendant went into a phone booth and closed a glass door to protect his privacy, Diaz and the other participants did not enter an enclosed space but stayed in an open, public area.

**e. The need for technological enhancements to hear the communications**

To address the fifth *Kee* factor, the government offers evidence that the FBI used recording devices that picked up only what could be heard by a human ear and did not amplify the conversations. Wynar Decl. (doc. no. 112-1) ¶ 11(b). FBI Special Agent Wynar states that the microphones used to make the recordings have the following

United States District Court
Northern District of California

characteristics: (1) they are omnidirectional, i.e., there is no additional gain in a particular direction; (2) the microphones lack equalization or noise cancellation; (3) the minimum sound pressure level detectable by the microphone is limited by its own electrical noise, which is specified by the manufacturer as 33.0dB (A-weighted), maximum, and (4) they are less sensitive than a healthy human ear. Wynar Decl. ¶ 11(b). As noted earlier, the sound quality of the audio recordings reflect that the recording devices only picked up voices in conversational or loud tones, and not hushed or whispered voices. *See United States v. Fisch*, 474 F.2d 1071, 1077 (9th Cir. 1973) (per curiam) (finding no reasonable expectation that conversations in hotel room would not be heard in the next room, noting that the "officers were in a room open to anyone who might care to rent [and] were under no duty to warn the appellants to speak softly, to put them on notice that the officers were both watching and listening.").

**f. The place or location of the oral communications in relation to the subjective expectations of the individuals who are communicating**

Given the proximity of Diaz and the other participants to the courthouse entrance, which was the site of the public auction, when they conducted their communications, the location of the conversations does not support a legitimate expectation of privacy.

In conclusion, while the court agrees with Diaz and his codefendants that the government would not likely have received prior judicial authorization for the surreptitious recordings and further that its decision not to use the recordings at trial was likely, at least in part, in recognition of the fact that the planting of the microphones might be looked upon unfavorably, the fact remains that the court must apply the *Kee* factors to the evidence of record. Defendants have cited no case that creates a zone of privacy in the public space surrounding the courthouse entry. Based upon the evidence submitted, the court finds that given the location of the rounds and the way in which they were conducted, Diaz's subjective expectation of privacy was unreasonable. Accordingly, the court finds that the warrantless recording of his conversations did not violate his rights

United States District Court
Northern District of California

under the Fourth Amendment. The court need not reach the issue of taint and thus an evidentiary hearing is not necessary.

**C. Record on Taint**

Although Diaz's Fourth Amendment rights are not violated by the recordings at issue, the court makes the following observations about the evidence that has been developed in the record addressing his arguments about possible taint, which may provide guidance to the parties and inform their trial strategy. Because Galloway does not join in the motion to suppress, the court limits its review to the recordings capturing Diaz.

The government has identified the uses made of the recordings at issue during the course of the investigation and presentation of the indictment. The government has provided declarations from both lead counsel and the case agent addressing defendants' concerns whether any confidential sources may have been persuaded to cooperate based on the illegal recordings, or whether any witnesses or lawyers were informed of the recordings as part of a reverse proffer by the government lawyers to induce cooperation.

The FBI played five stationary courthouse recordings to four witnesses, one of whom heard a recording that may have captured Diaz's voice, 1D619.001_part 1. Wynar Decl. ¶ 14. That witness, Joseph Vesce, had already been interviewed four times prior to having the audio recording played for him on October 17, 2014. Wynar Decl. ¶ 18 and Ex. F (under seal). That witness had already pleaded guilty before the audio/video recording was played for him; he identified Diaz in the recording and did not provide any new or additional information about the content of the recording. *Id.* ¶¶ 17-18. Under these circumstances, and given the court's familiarity with the proceedings against the witness, the court finds no material issue whether the recordings would have influenced the witness's decision to cooperate, given that he had entered his guilty plea on August 7, 2013, in case number CR 13-415 PJH, before being played the courthouse audio recording in October 2014.

The government represents that the recordings of Diaz were not played for the grand jury and were not played for other witnesses or to attorneys as part of any plea negotiations. Sambat Decl. ¶¶ 4-8. Thus, the record does not present potential taint issues as to those possible uses of the recordings.

## V. CONCLUSION

For the reasons set forth above, the court GRANTS defendants' motion to dismiss the mail fraud counts and the alternative motion to strike the omissions theory; DENIES defendants' motion for a bill of particulars; DENIES defendants' motion to adjudicate the Sherman Act allegations pursuant to the rule of reason; and DENIES defendants' motion to suppress audio recordings.

**IT IS SO ORDERED.**

Dated: August 15, 2016

______________________________
PHYLLIS J. HAMILTON
United States District Judge