MICAH L. RUBBO (CSBN 267465)
ALEXIS J. LOEB (CSBN 269895)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
alexis.loeb@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN MICHAEL GALLOWAY,<br>NICHOLAS DIAZ,<br>GLENN GUILLORY, and<br>THOMAS JOYCE,<br><br>　　　　　　Defendants. | CASE NO. CR 14-00607 PJH<br><br>**DECLARATION OF FBI SPECIAL AGENT DEBORAH BOND IN SUPPORT OF UNITED STATES' NOTICE OF COCONSPIRATOR STATEMENTS** |

No. CR 4:14-00607 PJH
DECL. IN SUPPORT OF US' NOTICE
OF COCONSPIRATOR STATEMENTS

I, Deborah Bond, do hereby declare:

1. I am a Special Agent with the Federal Bureau of Investigation. Since September 2009, I have been the lead case agent in the FBI's investigation into allegations of bid rigging and fraud at public real estate foreclosure auctions in the San Francisco Bay Area, including Contra Costa County. The following statements are based on my personal knowledge and review of witness reports, FBI 302s, documents, recordings, and other evidence and information available to me in my official capacity and from other FBI agents and DOJ staff involved in the investigation.

2. Numerous cooperating defendants have indicated that they and other bidders would agree before or during the public auction to refrain from bidding, including Hilton Wong (April 10, 2012 interview), Joseph Vesce (October 23, 2013 interview), Douglas Ditmer (May 8, 2014 interview), and Wesley Barta (May 29, 2014 interview).

3. In his November 9, 2011 interview, cooperating defendant Doug Moore indicated that bidding at the public auction would sometimes proceed in increments of $100 until the conspiring bidders decided exactly who would be in the round and who would win the public auction.

4. In his August 29, 2011 interview, cooperating defendant David Margen indicated that during the public auction, some of the colluding bidders would say words similar to, "Let's do a deal" or "Can I take it?" or "Do you want to take it?" Alternatively, the colluding bidders would exchange winks, nods, or whispers.

5. In his May 1 and 2, 2013 interview, cooperating defendant Michael Renquist indicated that after a group of bidders decided to conduct a round, a designated bidder would buy the property at the public auction and the others would stop bidding.

6. In his August 29, 2011 interview, cooperating defendant David Margen indicated that during the public auction the bidders would first outbid any bidders who didn't participate in round-robin auctions.

7. In his October 25, 2011 interview, cooperating defendant Grant Alvernaz indicated that after the public auction, the winning bidder would give the crier endorsed cashier's checks. The crier would not fill out the receipt of sale until there was a break or until the end of the auctions. During this time period, the round participants would hold a round. After the round was completed, the winner of

the round and the winner of the public auction would go to the crier to fill out the receipt and to swap out the checks.

8. In his December 12, 2011 interview, cooperating defendant Grant Alvernaz explained that "step-asides" were agreements made during a public auction to stop the competitive bidding between Alvernaz's group and another bidder. Alvernaz further stated that defendant Galloway initiated step-aside agreements with Alvernaz.

9. In his May 1 and 2, 2013 interview, cooperating defendant Michael Renquist indicated that during a round, the participants would form a circle and each participant would bid in increments such as $200 or $500.

10. In his April 29, 2014 interview, cooperating defendant Thomas Bishop indicated that the round payoff formula was based on when each participant dropped out of a round; the longer a bidder stayed in the round, the more that person received.

11. In his May 29, 2014 interview, cooperating defendant Wesley Barta stated that defendant Galloway kicked people out of rounds if they did not have sufficient funds to pay for a property.

12. In his May 29, 2014 interview, cooperating defendant Wesley Barta described an instance where bidders had two seats in rounds.

13. In his November 16, 2012 interview, cooperating defendant Robert Kramer described round insurance roughly as follows: If a round participant was interested in purchasing the property, he or she could offer "insurance" to another round participant. An insured round bidder has no interest in owning the property and will be insured by another round bidder against the possibility of winning the round. In return, the insured bidder pays half of the money he wins at the round to the insuring bidder. The insuring bidder will therefore pay out less if the insuring bidder wins the property. If the insuring bidder drops out of the round, he will receive a greater share of the round payout.

14. In their January 9, 2014 interview, witnesses David Brown and Jenny Taylor, both employees of trustee company Fidelity National Title Company, indicated that the trustee uses the information recorded on the receipt of funds to prepare the trustee's deed. The trustee would mail the funds to their client and the Trustee's Deed to the buyer using the information listed on the sales receipt.

15. In his September 10, 2014 interview, auctioneer Darius Ancheta indicated that he sent the original cashier's checks and the original receipt of funds using FedEx to the trustee company for each property sold at auction.

16. In his September 7, 2011 interview, cooperating defendant David Margen indicated that it was common practice to pay round money after the winning bidder received the trustee's deed in the mail.

17. In his January 11, 2011 interview, cooperating defendant Thomas Bishop indicated that round payments were usually paid by cash or check.

18. In his August 11, 2011 interview, cooperating defendant Thomas Legault indicated that he would pay any payoff money after the trustee's deed was recorded.

19. In his November 16, 2012 interview, cooperating defendant Robert Kramer indicated that he met with other round participants from time to time to clear his round debts. Kramer would compare his calculations with each other person's calculations and had discussions with each person if the calculations were different. He did this at the foreclosure auctions and at the other person's office.

20. In his January 11, 2011 interview, witness James Campos stated that he and defendant Galloway are managing members of Norcal Real Estate (Norcal).

21. In his January 11, 2011 interview, defendant Diaz stated that he works for his half brother, defendant Galloway, and attends the Contra Costa County auctions.

22. In his September 11, 2014 interview, cooperating defendant Timothy Powers stated that defendant Diaz attended the trustee sales with and on behalf of defendant Galloway.

23. In his September 18, 2015 interview, cooperating defendant Charles Rock identified Galloway Properties as an entity belonging to defendant Galloway.

24. In his January 11, 2011 interview, defendant Galloway stated that he and defendant Diaz purchase properties for themselves and other clients and work mostly in Contra Costa County.

25. In his October 19, 2012 interview, cooperating defendant Doug Ditmer stated that Galloway was a regular bidder at the Contra Costa County trustee sales.

26. In his September 11, 2014 interview, cooperating defendant Timothy Powers described Galloway as one of the most notorious individuals at the Contra Costa County trustee sales, who was aggressive and instigated fist fights over rounds with people he did not believe should be in a round.

27. In his October 25, 2011 interview, cooperating defendant Grant Alvernaz indicated that Galloway organized rounds and decided who could participate in them.

28. In his January 11, 2011 interview, cooperating defendant Wesley Barta characterized defendant Galloway as one of the "big fish" in the foreclosure market.

29. In his August 11, 2011 interview, cooperating defendant Thomas Legault indicated that defendant Galloway harassed bidders who were not willing to cooperate with him. He frequently bid up properties that one noncooperating bidder was interested in, and yelled out loud "Don't let him have it!" when another was bidding.

30. In his November 15, 2011 interview, cooperating defendant Timothy Powers recalled an instance where defendant Galloway negotiated a $100,000 payment from another bidder in exchange for not bidding against her.

31. In his November 21, 2013 interview, cooperating defendant Joseph Vesce indicated that he and defendant Galloway paid each other for rounds.

32. On April 29, 2014, cooperating defendant Thomas Bishop indicated that he and defendant Galloway paid each other for rounds.

33. On January 11, 2011, defendant Glenn Guillory indicated that he owns Integrity Investment Group, LLC. Guillory buys property for his "investors," who are his family and friends. He employs his son, Anthony Guillory, and sends him to auctions in his place. Guillory has been attending public real estate foreclosure auctions since 2003.

34. In his April 22, 2014 interview, cooperating defendant Rudy Silva recalled that Glenn Guillory paid him for a round at a 7-Eleven. Cooperating witnesses Thomas Bishop and Joseph Vesce also indicated that they made and received payments from Guillory for rounds, in their interviews on April 29, 2014, and November 21, 2013, respectively.

35. In his March 12, 2012 interview, cooperating defendant Barry Heisner indicated that if both Glenn and Anthony Guillory were present during an auction and agreed to join a round, they sometimes had two seats in the round.

36. In his April 29, 2014 interview, cooperating defendant Thomas Bishop indicated that he observed defendant Diaz on the phone during auctions and rounds and believed Diaz was on the phone with defendant Galloway. Cooperating defendant Wesley Barta also indicated, in his May 29, 2014 interview, that he overheard Galloway yelling at Diaz through Diaz's phone when Diaz was at the auctions.

37. In his October 25, 2011 interview, cooperating defendant Grant Alvernaz indicated that Diaz came to the office of Alvernaz Partnership to collect round money. Thomas Bishop also indicated, in his April 29, 2014 interview, that he may have given money for rounds to Diaz for Galloway.

38. In his September 26, 2016 interview, cooperating defendant Michael Renquist indicated that Glenn Guillory organized and participated in rounds, but also negotiated payoff agreements if only a few people expressed interest in a property.

39. In his January 11, 2011 interview, defendant Thomas Joyce indicated that he worked for Les Gee at Majestic Realty.

40. In his May 1, 2013 interview, cooperating defendant Michael Renquist indicated that Joyce had worked with Robert Kramer.

41. In his January 11, 2011 interview, defendant Thomas Joyce acknowledged having participated in rounds, estimating that he participated in twenty rounds over a two-year period, earning approximately $10,000 from his share of round payments. Joyce drew an example of a round sheet and explained the calculation of payouts. He also explained "offsetting," whereby round participants could offset amounts owed from rounds with bids in future rounds. Joyce also voluntarily provided the interviewing FBI agents with a black binder containing dozens of round sheets that he had created.

42. In a February 22, 2013 interview, cooperating defendant Robert Kramer indicated that Joyce was hired by Les Gee to keep track of rounds and calculate what was owed to each participant for

each round that Joyce and Kramer participated in on behalf of Gee. Gee paid Joyce by the hour, plus expenses for mileage and possibly a percentage of money received from rounds.

43. Several witnesses have identified the defendants as participants in the rounds. Over 15 cooperating defendants identified Galloway as a participant in the rounds. At least eleven cooperating defendants have identified Glenn Guillory as a participant in rounds, either personally or through his son, Anthony Guillory. At least nine witnesses have implicated defendant Diaz in rounds. At least seven cooperating defendants identified Joyce as a round participant.

44. In an October 19, 2012 interview, cooperating defendant Doug Ditmer indicated that defendant Michael Marr had a standard round-sheet format. In a November 16, 2012 interview, cooperating defendant Robert Kramer explained that a round sheet typically contained the initials or names of each participant and each bid they placed during the round. In an April 10, 2012 interview, cooperating defendant Hilton Wong described round sheets kept by four other participants in the rounds.

45. In a November 21, 2013 interview, cooperating defendant Joseph Vesce indicated that he received a ledger from defendant Michael Marr's employee (defendant Javier Sanchez), which Vesce and Marr used to reconcile the amounts they owed each other.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 8 day of November in Oakland, California.

Respectfully submitted,

*Deborah J Bond*
DEBORAH BOND
Special Agent
Federal Bureau of Investigation

No. CR 4:14-00607 PJH
DECL. IN SUPPORT OF US' NOTICE
OF COCONSPIRATOR STATEMENTS        6