ALEXIS J. LOEB (CSBN 269895)
THOMAS GREENE (CSBN 57159)
KELSEY C. LINNETT (CSBN 275457)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
thomas.greene@usdoj.gov
Telephone: (415) 934-5300

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GLENN GUILLORY and THOMAS JOYCE,<br><br>Defendants. | CASE NO. CR 4:14-00607 PJH<br><br>**UNITED STATES' OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTIONS**<br><br>Pretrial Conference: January 11, 2017<br>Court: Hon. Chief Judge Phyllis J. Hamilton<br>Trial Date: January 23, 2017 |

No. CR 4:14-00607 PJH
U.S. OBJECTIONS TO
DEFS' JURY INSTRS

The United States respectfully submits the following responses to defendants' proposed jury instructions as described in the parties' Stipulated and Disputed Proposed Jury Instructions (Dkt. 191), Defendants' Joint Memorandum Re Disputed Jury Instructions (Dkt. 195), and Defendants' Proposed Jury Instruction Regarding Multiple Conspiracies (*id.* at Ex. A).  Instruction numbers refer to the numbers used in the parties' Stipulated and Disputed Proposed Jury Instructions (Dkt. 191).

## ARGUMENT

### I. United States' Jury Instruction No. 15 Regarding the Charged Offense Quotes the Pertinent Language of the Sherman Act

Defendants have not agreed to the government's proposed Jury Instruction No. 2 regarding the charged offense.  The source of this instruction is the ABA Model Jury Instructions for Criminal Antitrust Cases.  ABA Section of Antitrust Law's *Model Jury Instructions in Criminal Antitrust Cases* 43 (2010) (hereafter "ABA Model Instructions").  This instruction provides the pertinent text of Section 1 of the Sherman Act and should be uncontroversial.  The text of the statute makes plain the importance of the concept of conspiracy in the statutory scheme of the Act, providing context for the subsequent instructions on conspiracy.

### II. United States' Jury Instruction No. 16 Regarding *Per Se* Violations of the Antitrust Laws Contains the Same Language Used in the First *Florida* Trial

On December 6, 2016, defendants sent an e-mail to the government withdrawing their objection to this instruction.

### III. United States' Jury Instruction No. 18 Regarding Bid Rigging Clarifies an Instruction Used in the First *Florida* Trial

This instruction starts with this Court's Instruction No. 3 in the *United States v. Florida, et al.* proceeding (No. 14-cr-00582) and makes two changes.  First, the language in the third paragraph (designated with double underlining) is proposed to be struck as unnecessary.  Defendant Joyce does not object to this change; defendant Guillory does.

The United States asserts that this language is unnecessary.  The apparent concern is that somehow jurors might mistakenly base a finding of conspiracy on agreements between Mr. Guillory and his son.  That appears to be far-fetched in light of the language in the first

paragraph stating that "[a] conspiracy to rig bids may be an agreement *among competitors*" to engage in various illegal activities (emphasis added). Mr. Guillory's son is not a "competitor" of defendant Guillory's, so this additional language is unnecessary and may cause confusion.

This situation is not like the *Florida* trial, where all of the defendants were at one time members of the same company. Here, defendants Guillory and Joyce were never colleagues, so there is no risk that the jury could convict defendant Guillory based solely on a view that he conspired only with his son. Even setting aside defendant Joyce, the government will introduce considerable evidence that rounds included numerous participants – sometimes more than ten. In light of this evidence, it would simply not be possible for a reasonable jury to conclude that Guillory took part in a conspiracy, but only with his son.

The second proposed change is to strike the last three paragraphs of the original instruction. Both defendants object to these changes. The language used in *Florida* is drawn from the ABA Model Instructions in Criminal Antitrust Cases. ABA Model Instructions at 61. The paragraphs the government proposes striking are add-ons to the basic instruction and are designated in the original ABA Model Instructions with brackets. A copy of the ABA instruction is attached as Exhibit A.

The counsel of the drafters of these instructions is that in using these add-on instructions, "[i]t is important to tailor this instruction to the particulars of each case in which it is used." *Id.* at 62. This is important according to the ABA because "[i]llegal bid rigging can take various forms, such as comparing bids prior to submission, operating bid repositories, rotating bids, agreeing to refrain from bidding, knowingly submitting noncompetitive bids, and agreeing to rig bids by creating sham competition." *Id.*

With respect to the add-on language in the fifth paragraph, the text discusses situations in which defendants "started undercutting one another right away, or submitted bids lower than those agreed upon to customers they did not want to lose." This appears to be an instruction designed to address a case in which conspirators are seeking to *increase* the price of goods or services and one or more of them breaks from the agreement by selling at prices below those set by the conspiracy. The case here is about bid suppression. It has nothing to do with

undercutting other conspirators by cutting prices *below* those agreed to by conspirators.  In the context of this case, this add-on paragraph provides guidance on a kind of bid-rigging case that is not before the jury, so may well confuse the task before the jury.

The sixth paragraph states that "similarity of business practices of the defendants and alleged conspirators does not alone establish an agreement to rig bids."  This language appears to be applicable to an alleged conspiracy directed at increasing prices to customers, as where there are parallel price increases.  Here, the gravamen of the case is a conspiracy to depress prices for purchases at foreclosure auctions by refraining from participating in a bidding process.  The government's case will not rely simply on "similar business practices."  An agreement to stop bidding at the public auction is not a case of "similarity of business practices."  A round is not a case of mere "similarity of business practices."  Since this language is not "tailor[ed]" to the indictment, it should be eliminated.

Likewise, the seventh and last paragraph appears to be inapposite.  It speaks in terms of "bids actually submitted" and "similarity of business practices."  The core allegation is that defendants depressed the purchase price of selected properties at public auctions by *not* bidding at all or *not* bidding above a certain price.  In the context of this case, language about "bids actually submitted" is confusing (and adds little to the other instructions, which already make clear that the jury is to decide whether there was a bid-rigging conspiracy).  In addition, defendants also support using the phrase "similarity of business practices."  There is no definition or explanation of these other unspecified "business practices," nor any indication that the defense in this case will claim that the government has focused on mere "similarity of business practices," so this is even more confusing.  Since this language is not "tailor[ed]" to the indictment, it may well confuse the jury and should be struck.

**IV.    United States' Jury Instruction No. 19 Regarding Elements of Conspiracy Is Identical to First *Florida* Trial Instruction No. 6**

Defendants have not stipulated to the use of this instruction because the United States has not agreed to the use of a multiple conspiracy instruction.  In the event that the Court determines that a multiple conspiracy instruction is necessary, the United States requests that the double

underlined language that is identical to the language used at the end of the first *Florida* trial Instruction No. 6 is necessary in order to accurately reflect Ninth Circuit jurisprudence. *See, e.g., United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977) ("the jury could find that there were several different agreements involving defendants, all of which would then connect the defendants to the general overall conspiracy as charged in the indictment"); *see also United States v. Eubanks*, 591 F.2d 513, 518 (9th Cir. 1979).

It is also needed to avoid jury confusion: the jury should not be led to believe that simply because an overarching agreement includes subagreements (such as individual decisions to rig bids for a particular property), there are multiple conspiracies. As in the *Florida* trial, there is a serious risk that the defense will try to convince the jury that because each property was rigged separately, there could not have been a single conspiracy. That is incorrect as a matter of law.

The appropriateness of a multiple conspiracy instruction, with or without additional language, is discussed in the arguments concerning Instruction No. 22 at pages 5-9.

**V.    United States' Instruction No. 21 Regarding Owner or Superior Responsibility Is Necessary Because Defendant Guillory Is Responsible for His Son's Activities in the Conspiracy**

Defendants have not agreed to the United States' proposed new instruction on superior liability for the actions of a subordinate. This instruction is necessary because defendant Guillory directed his son's activities in support of the conspiracy, so defendant Guillory is responsible for his son's actions.

The seminal case in support of this instruction is *United States v. Wise*, 370 U.S. 405 (1962). There, the high court concluded that "a corporate officer is subject to prosecution under § 1 of the Sherman Act when he knowingly participates in effecting the illegal contract, combination or conspiracy—be he one who authorizes, orders or helps perpetrate the crime." *Id.* at 416; *see also United States v. Brown*, 936 F.2d 1042, 1047-48 (9th Cir. 1991). Indeed, in some circumstances, "the Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or

promptly to correct, the violation complained of, and that he failed to do so." *United States v. Park*, 421 U.S. 658, 673-74 (1975) (violation of Federal Food, Drug and Cosmetic Act).

With one excision, proposed Instruction No. 8 is identical to an ABA Model Instruction. ABA Section of Antitrust Law, *Model Jury Instructions in Criminal Antitrust Cases* 101-102 (2010). This model instruction is reproduced in Appendix B. The one change is that the last sentence of the first paragraph of the model instruction is deleted because it repeats concepts already discussed in the paragraph. The sentence read: "A person is responsible for conduct that [he] [she] performs or causes to be performed on behalf of a corporation just as though the conduct were performed on [his] [her] behalf."

Given the facts of this case regarding defendant Guillory, this instruction provides appropriate and necessary guidance to the jury.

**VI.    Disputed Instruction No. 22 Regarding Multiple Conspiracies Is Untimely and Unnecessary**

It is black-letter law in the Ninth Circuit that the need for a multiple conspiracy instruction must await "proof at trial [that] showed multiple conspiracies." *Perry*, 550 F.2d at 532. This principle is reflected in this Court's deferral of consideration of a multiple conspiracy instruction in *Florida* until after the close of evidence. *United States v. Florida, et al.,* No. 14-cr-00582, Pretrial Order No. 3, Dkt. 284 (Oct. 18, 2016) at 16-17.

It is highly unlikely that such an instruction will be appropriate in this case. As explained in *United States v. Zemek*, 634 F.2d 1159 (9th Cir. 1980):

> The general test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy. *United States v, Kearney*, 560 F.2d 1358, 1362 (9th Cir.), *cert. denied*, 434 U.S. 971 (1977). Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement." *United States v. Friedman*, 593 F.2d 109 (9th Cir. 1979). The general test also comprehends the existence of subgroups or subagreements.

*Id.* at 1167.

In this case, the evidence will show that conspirators had an overall agreement to suppress bids in order to secure foreclosure properties at a discount and then allocate these properties among themselves, with each participant either getting the property or receiving a payment for his participation in the scheme. While the participants in specific auctions changed

depending on the interest of individual conspirators in specific properties, the overall agreement stayed the same. Thus, this case meets the *general* "overall agreement" test for showing a single conspiracy.

Likewise, the evidence will show that a single conspiracy can be demonstrated based on the "'factors' analysis" used by other circuits. *Id.* at 1168. Under this approach, the "[r]elevant factors include the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of time and goals." *Id.* Briefly, the evidence will show that:

1. Nature of the Scheme: The scheme was not limited to bidding on a single property, but included an agreement to suppress bids on numerous properties. Conspirators repeatedly used the same playbook to reach their illegal goals, whose rules included the following:
   a. Conspirators must "qualify" to participate in the public auction by providing proof of qualification, typically by providing the auctioneer (or "crier") with certified checks for the cost of the property.
   b. Conspirators would refrain from bidding or end bidding early in order to secure properties cheaply.
   c. Conspirators would subsequently conduct a "round" near the location of the public auction in order to select from among themselves who would get the price-suppressed property.
   d. Records of the rounds would be maintained to record the bids during the round and to determine what was owed by the "winning" bidder to the "losing" bidders.
   e. "Winning" conspirators would subsequently pay the "losing" bidders for engaging in bid suppression according to a preset formula. Some payments would be made soon after the purchase was recorded; other payments would be collected based on running "tabs" that were settled over time.

2. Identity of Participants: Participants included a number of bidders who would participate in specific auctions. Once accepted into the conspiracy, conspirators could participate in the conspiracy when they had an interest in specific properties. Members of the conspiracy participated in the bid rigging of numerous properties.

3. Quality, Frequency and Duration of Each Conspirator's Transactions: Each conspirator participated in bid suppression with other conspirators, usually followed by a "round" to allocate the property purchased based on bid suppression. In some instances, a defendant would get the property; in others, he would receive a payoff for not bidding. Members of the conspiracy, including the defendants, typically participated in numerous illegal transactions. The

> defendants participated in the conspiracy over all three years of the charged period, sometimes rigging multiple properties per day.  As for the "quality" of their participation, in each instance of the conspiracy, conspirators (or their representatives) participated face-to-face with other conspirators to suppress bids on properties in Contra Costa County under a common scheme using a common methodology.
>
> 4. Commonality of Time and Goals:  The overall goal was to either secure foreclosure properties at a cheaper price or receive payoffs for not bidding on properties.  The indictment alleges that the conspiracy lasted for over two years until the coconspirators learned that their conspiracy had been uncovered; the participants in the conspiracy all participated during the June 2008-January 2011 time period alleged in the indictment.

In summary, the United States will demonstrate that there is only one overall conspiracy using either the overall agreement test or the factors test.  Therefore, there is no reason to provide a multiple conspiracy instruction.

**VII.   Defendants' Proposed Amendment to the Multiple Conspiracy Instruction Misstates the Law**

Defendants propose to have the Court read the instruction on multiple conspiracies with a significant additional paragraph.  The new paragraph reads:

> To establish the existence of a single conspiracy, rather than multiple conspiracies, the government must prove that an overall agreement existed among the conspirators.  The relevant factors for you to consider to distinguish single from multiple conspiracies include: the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals.

*United States v. Joyce and Guillory*, No. 14-cr-00607, Defendants' Joint Memorandum Re Disputed Jury Instructions, Dkt. 195 (Nov. 23, 2016), App. A.

There are at least two major problems with this new paragraph.  First, although the first sentence appears to reference the overall agreement test, the second sentence conflates that test with the factors test. This is wrong.  *Kearney*, 560 F.2d at 1362; *Friedman*, 593 F.2d at 115. The factors test is a way to determine whether there is one conspiracy or several.  But the "general" test is the overall agreement test.  *Zemek*, 634 F.2d at 1167.

This is an important distinction because defendants would require the government to meet every element of the factors test in order to demonstrate the existence of a single conspiracy.  This is further problematic because these factors are not explained in lay terms,

No. CR 4:14-00582 PJH
U.S. OBJECTIONS TO
DEFS' JURY INSTRS                      7

creating a very real possibility of jury confusion. For example, the jury is left to wonder what "identity of the participants" means and exactly how much "identity" there must be in order for them to find that there was a single conspiracy.

Second, defendants ignore the language in the cases finding that separate conspiracies can be consistent with the existence of an overall conspiracy. For example, the *Perry* court, reviewing an instruction similar to the one offered by defendants, wrote:

> We find that this multiple conspiracy instruction *incorrectly states the law,* and the trial court, therefore, properly refused it. The crucial point that defendants miss in this case is that the jury could find that there were several different agreements involving the defendants, all of which then connect the defendants to the general overall conspiracy as charged in the indictment . . . . To suggest that defendants should be acquitted of the general conspiracy charge because some of them met singly with other defendants and conspired with them to carry out the overall common distribution plan is a misapplication of the law of conspiracy.

*Perry*, 550 F.2d at 532-33 (emphasis added). Defendants here should not be permitted to argue that they should be acquitted because they did not have enough contact with each other, because they did not both interact with certain other members of the conspiracy, or because they participated in rigging only some of the properties.

Moreover, "the law is well established that 'one may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him.'" *United States v. Bibbero*, 749 F.2d 581, 588 (9th Cir. 1984) (defendant who did not participate in all transactions of conspiracy convicted). The point is the same: defendants were not part of separate conspiracies simply because they did not participate, or even know about, every single bid-rigging transaction.

Finally, in *Brandon,* a case relied on by defendants, the First Circuit opined that "[a] single conspiracy exists where the totality of the evidence demonstrates that 'all of the alleged co-conspirators directed their efforts towards the accomplishment of a common goal or overall plan. [citations omitted]." *United States v. Brandon*, 17 F.3d 409, 450 (1st Cir. 1994). The Court found specifically that "[t]he fact that different defendants were involved in separate transactions for the purchase of different properties . . . is not significant so long as there is a single continuing plan." *Id.* at 451. In reaching this conclusion, the court charaterized the

different transactions as "multiple executions" of the overall conspiracy. *Id*. at 423. *Brandon* supports the government's position – that involvement in separate transactions does not mean there were multiple conspiracies – and undermines the defendants'.

### VIII. If a Multiple Conspiracy Instruction Is to Be Given, *Perry* Language Should Be Added

The Ninth Circuit cases are clear that the existence of multiple subagreements may be consistent with the existence of an overall single conspiracy. *See, e.g., Perry*, 550 F.2d at 533. Specifically, "a single conspiracy may involve subgroups or subagreements." *United States v. Tille*, 729 F.2d 615, 621 (9th Cir. 1984). The Court included this language in the jury instructions in *Florida*.

To fully reflect the Ninth Circuit's jurisprudence on conspiracy law– if the Court decides to give a multiple conspiracies instruction– the government suggests (1) striking the new second paragraph proposed by defendants, and (2) inserting as a new second paragraph the following:

> Subagreements may be part of a general conspiracy. You may find that defendants participated in the general conspiracy if through their separate agreements they became part of a larger common plan with knowledge of its essential features and scope, though not of the exact limits, and by their single goal.

This language paraphrases the key language in *Perry* and more properly reflects Ninth Circuit law on single vs. multiple conspiracies by ensuring that the jury does not conclude that there were multiple conspiracies because different members of the conspiracy could decide to participate in the rigging of a particular property. *Perry*, 550 F.2d at 532. This language should avoid the legal error inherent in defendants' proposed instruction.

### IX. United States' Jury Instruction No. 23 Regarding Interstate Commerce Is Identical to the Instruction Used in *Florida*

On December 6, 2016, defendants sent an e-mail to the government withdrawing their objection to this instruction.

### X. United States' Instruction No. 24 Regarding Testimony of Witnesses Involving Special Circumstances Is Identical to the Instruction Used in *Florida*

On December 6, 2016, defendants sent an e-mail to the government withdrawing their objection to this instruction.

//

**CONCLUSION**

The government respectfully requests that the Court provide the jury with the government's proposed jury instructions.

DATED: December 7, 2016

Respectfully submitted,

_____/s/_____
Thomas Greene
Alexis J. Loeb
Kelsey C. Linnett
Trial Attorneys
Antitrust Division
U.S. Department of Justice