MICAH L. RUBBO (CSBN 267465)
ALEXIS J. LOEB (CSBN 269895)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
micah.rubbo@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

NICHOLAS DIAZ,

Defendant.

Case No. CR 14-00602 PJH

**UNITED STATES' SENTENCING MEMORANDUM**

Date: March 8, 2017
Time: 2:30 p.m.
Court: Honorable Phyllis J. Hamilton

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iii
INTRODUCTION ........ 1
PROCEDURAL BACKGROUND ........ 1
FACTUAL BACKGROUND ........ 1
I. Diaz' Role in the Conspiracy ........ 1
A. Bid-Rigging Captured by the Undercover FBI Agent ........ 2
B. Diaz Collected Thousands of Dollars in Payoff Money for Galloway ........ 3
II. Consciousness of Guilt ........ 3
SENTENCING GUIDELINES AND RECOMMENDED SENTENCE ........ 4
I. Guidelines Calculations ........ 4
A. Criminal History ........ 4
B. Offense Level ........ 5
C. Fine and Restitution ........ 5
II. A Sentence of 10 Months Is Reasonable and Appropriate ........ 5
A. A 10-Month Custodial Sentence Is Necessary to Avoid Unwarranted Sentencing Disparity ........ 6
B. A 10-Month Custodial Sentence Is Appropriate Because of the Seriousness of the Crime ........ 7
C. A 10-Month Custodial Sentence Is Required to Promote Respect for the Law ........ 8
D. A 10-Month Custodial Sentence Is Necessary to Adequately Deter Future Violations of Antitrust Law ........ 9
III. There Is No Basis to Vary from the Guidelines ........ 11
CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**CASES**

*Furman v. Georgia*,
408 U.S. 238 (1972) ... 10

*United States v. Barker*,
771 F.2d 1362 (9th Cir. 1985) ... 10

*United States v. Gurinas*,
187 F. App'x 647 (7th Cir. 2006) ... 9

*United States v. Musgrave*,
761 F.3d 602 (6th Cir.2014) ... 12

*United States v. Ruff*,
535 F.3d 999 (9th Cir. 2008) ... 10

Regulations

15 U.S.C. § 1 ... 1

18 U.S.C § 3553(a)(2)(A) ... 8

18 U.S.C. § 3553(a) ... 6

18 U.S.C. § 3553(a)(2) ... 6

18 U.S.C. § 3553(a)(2)(B) ... 9

18 U.S.C. § 3553(a)(6) ... 6

**RULES**

Federal Rule of Criminal Procedure 11(c)(1)(A) ... 1

U.S.S.G. :
§2R1.1 ... 5, 7, 10
§2R1.1(b)(1) ... 5
§2R1.1(b)(2) ... 7
§2R1.1(c)(1) ... 5
§3B1.2(b) ... 5
§3E1.1(a) ... 5
§4A1.1(d) ... 9
§5H1.2 ... 12
§5H1.5 ... 12

§5H1.10 .......... 12

**OTHER AUTHORITIES**

S. Rep. No. 98-225 (1983) .......... 10

## INTRODUCTION

The United States respectfully requests that this Court sentence defendant Nicholas Diaz to (1) serve 10 months in prison, (2) serve three years of supervised release, (3) be sentenced to community service in lieu of a criminal fine, and (4) pay a $100 special assessment. This sentence is consistent with the parties' Federal Rule of Criminal Procedure 11(c)(1)(A) and (B) plea agreement.

## PROCEDURAL BACKGROUND

On December 3, 2014, a grand jury sitting in the Northern District of California returned an indictment charging defendant and four coconspirators – John Michael Galloway, Nicholas Diaz, Charles Rock, Thomas Joyce, and Glenn Guillory – with a conspiracy to rig bids in violation of the Sherman Act, 15 U.S.C. § 1. Defendant Charles Rock originally pleaded guilty on December 24, 2014 and entered a new plea agreement on October 19, 2016. Defendant Diaz and Galloway pleaded guilty on November 16, 2016. Defendant Thomas Joyce was convicted on February 6, 2017 after a five-day jury trial and is scheduled to be sentenced on May 10, 2017. Defendant Glenn Guillory is scheduled for trial on April 10, 2017.

## FACTUAL BACKGROUND

For over a year, defendant Diaz participated in a conspiracy to rig bids for select properties sold at the Contra Costa foreclosure auctions.[1] Diaz worked for his brother, codefendant John Michael Galloway, owner of Galloway Properties, LLC. From August 2009 to January 2011, Diaz rigged at least 26 properties on behalf Galloway, resulting in $157,700 in illegal payoffs. Diaz was owed over $14,000 for his participation alone. A chart identifying these transactions is attached as Exhibit A. As described below, Diaz played an essential role in the conspiracy and helped his brother reap thousands of dollars in illegal payoffs.

### I. Diaz's Role in the Conspiracy

Diaz worked for his brother's company, Galloway Properties, L.L.C. *See* Declaration of Micah L. Rubbo ("Rubbo Decl."), ¶ 2. Galloway was a real estate investor who purchased

---

[1] A detailed description of the conspiracy is contained in the United States' Notice of Coconspirator Statements, doc. no. 166, at 8-11

properties at the Contra Costa foreclosure auctions on behalf of investors. *See id.* at ¶ 3. Galloway, who began participating in rounds at least as early as June 2008, already had an established leadership role in the conspiracy by the time Diaz joined in 2009.[2] Galloway hired Diaz to be his representative during the trustee sales and in the rounds. Galloway showed Diaz how the conspiracy operated and directed him to participate on his behalf. Sometimes both Galloway and Diaz would attend the auctions together, each taking a "seat" in the round. *Id.* at ¶¶ 4, 7, 10-12. At other times, Diaz would attend the auctions on his own and operate under the direction of Galloway via telephone. *Id.* at ¶¶ 4, 5, 7, 12.

Because Galloway was such a major player in the Contra Costa County bid-rigging conspiracy, it did not take long for Diaz to also become deeply involved. At least 15 witnesses implicate Diaz in the bid rigging conspiracy, including the undercover FBI agent ("UCE"). *Id.* at ¶ 8. In fact, Diaz rigged two properties with the UCE on the same day – 4003 Roland Drive, Concord and 374 Topaz Street, Brentwood. Both were caught on tape.

**A. Bid-Rigging Captured by the Undercover FBI Agent**

The audio video recordings made by the UCE of these properties illustrate how Diaz and Galloway worked together in the conspiracy. On the Roland round, for example, Diaz wears white headphones and relays information about the bidding in the round to Galloway over the phone. Diaz tells Galloway how much is being bid in the round and waits before for a response before saying "we're in." *See* Exhibit B.

Diaz used his brother's clout in the conspiracy to establish credibility and gain bargaining power, as illustrated by the end of the round for 374 Topaz. Diaz and the UCE are the last two bidders in the round. As a result, the group of coconspirators instructs them to work out a deal. Diaz starts the negotiations by making sure the UCE knows that the UCE is also dealing with Galloway before asking for an additional $2,000 payoff:

SLIPPER: He wants to close. Make him an offer.

---

[2] A short description of Galloway's role and participation in the conspiracy can also be found in the United States' Notice of Coconspirator Statements, doc. no. 166 at 12.

DIAZ: I'm Galloway's brother.
UCE: Right.
DIAZ: Another 2 grand.
UCE: I give you 2 on top of this?
DIAZ: You give me 2 on top of this.

Exhibit C at 9. In this way, Diaz was able to gain two thousand dollars, in addition to what was owed to him in the round, for his brother's business.

### B. Diaz Collected Thousands of Dollars in Payoff Money for Galloway

Diaz played another important role in the conspiracy. He was often responsible for collecting or receiving the money owed to the Galloway organization for rounds. Several coconspirators recall paying Diaz for rounds. For example, coconspirator Grant Alvernaz recalls Diaz coming to his office to collect round money. Rubbo Decl. at ¶ 6. Similarly, coconspirators Joseph Vesce and Thomas Bishop recall making and receiving payoffs with Diaz. *Id*. at ¶ 7; 9. In fact, even the UCE paid Diaz. The day after the round on the Topaz property, the UCE gave Diaz $1,500 in cash on the steps of the Contra Costa courthouse. *See* Exhibit D. Thus, Diaz was responsible for helping his brother reap the benefits of the conspiracy.

## II. Consciousness of Guilt

There is also evidence that Diaz and the other coconspirators knew that what they were doing was illegal. The conspiring bidders formed their agreements not to compete at the public auction using code words and non-verbal gestures, so as not to attract the attention of the auctioneers and the other bidders. Rubbo Decl. at ¶ 13. The members of the conspiracy conducted rounds away from the courthouse steps and suspended the rounds if an outsider happened to walk by. *Id*. at ¶ 14; Exhibit B at 22. Round payments were supposed to be paid in cash so as not to leave a paper trail. *Id*. at ¶ 15. Numerous witnesses have described their belief that the conspirators knew that what they were doing was wrong or illegal and should be kept secret. *Id*. at ¶¶ 16-18.

The evidence suggests that Diaz was well aware of this need for secrecy. For example, during the round for the Topaz property, Diaz and the other conspirators got spooked by an auctioneer who was attempting to get the group's attention during the round. Diaz commends Joseph Vesce on how he is able to allay the auctioneer's fears:

| | |
|---|---|
| UCE: | Yeah. He asked me, when I went over there – |
| VESCE: | He got the... I got... I got... |
| UCE: | – I wanna, wanna [*UI*] you first, "what were you guys doing over there?" |
| VESCE: | He's like a rookie. He doesn't… Don't worry about it. The good part is he really doesn't know anything. |
| DIAZ: | Joe, you're the glue, man. |
| HEISNER: | All we're doing is ahh… |
| UCE: | All you gotta say is [UI] |
| HEISNER: | Say we're just giving you advice on the property. |
| DIAZ: | Joe's the glue, and he helps a [] lot. |

Exhibit C at 10. Diaz understood that the true reason the conspirators were meeting had to be kept from the auctioneers and expresses his gratitude that Vesce is able to do just that. Diaz's role required him to collect thousands of dollars *in cash* and make up excuses to the auctioneers as to why he was gathering with his competitors. That is not business as usual. That is not a company that is operating above-board.

In summary, while Diaz was not one of the leaders of this conspiracy, he was essential in helping his brother's company profit from it. Diaz collected thousands of dollars, often in cash, for Galloway. He was a frequent, well-recognized representative of one of the more powerful forces behind the conspiracy. He did not shy away from this role, even though it meant engaging in illegal behavior.

## SENTENCING GUIDELINES AND RECOMMENDED SENTENCE

### I. Guidelines Calculations

#### A. Criminal History

In Paragraph 12 of the Plea Agreement, the parties agree that defendant's Criminal History Category is determined by the Court. The probation officer calculated defendant's Criminal History Category as II, based on his convictions for alcohol-related offenses, resulting in three criminal history points. PSR ¶¶ 38-40. The government agrees.

/ /

/ /

**B. Offense Level**

The Probation Office calculated the total offense level as 9. PSR ¶ 35. The plea agreement also calculates the total offense level as 9. This calculation includes a one-level increase for conduct involving the submission of non-competitive bids, a downward reduction for minor role, and a downward reduction of two points for acceptance of responsibility. U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1), 3B1.2(b), 3E1.1(a) (U.S. Sentencing Comm'n 2016). Under the Guidelines, an offense level of 9 and Criminal History Category of II results in a sentence ranging from 6 to 12 months.

**C. Fine and Restitution**

Under Section 2R1.1(c)(1), the fine for an individual is one to five percent of the volume of commerce, but not less than $20,000. U.S.S.G. §2R1.1(c)(1). Here, Diaz's fine would be between $20,000 and $23,421 because his volume of commerce is stipulated to be $468,420. In accordance with paragraph 9 of Diaz's plea agreement, however, the government recommends that the Court not impose a fine. Information provided to the government during plea negotiations indicated that Diaz lacked the ability to pay a fine. After reviewing his financial disclosures, Probation reached the same conclusion. PSR ¶ 83. The government also does not believe restitution is appropriate in this case because Diaz passed payoffs he received from rounds on to Galloway. Thus, to avoid double-counting, Galloway should be required to pay any restitution owed. This is consistent with paragraph 11 of the Plea Agreement.

The government does, however, recommend that the Court order Diaz to perform community service. An Application Note to section 2R1.1 provides that "[i]f the court concludes that the defendant lacks the ability to pay the guideline fine, it should impose community service in lieu of a portion of the fine. The community service should be equally as burdensome as a fine." U.S.S.G. §2R1.1 cmt. n.2. Therefore, if the Court concludes that Diaz cannot pay a criminal fine, it should require community service.

**II. A Sentence of 10 Months Is Reasonable and Appropriate**

Diaz's Guidelines assessment thus results in a recommended sentence of 6 to 12 months. The government's recommendation of 10 months' imprisonment is reasonable and not greater

than necessary in light of the factors articulated in 18 U.S.C. § 3553(a). The most compelling factors weighing in favor of the proposed term of imprisonment are the need to avoid an unwarranted sentencing disparity, for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2).

Probation recommended a variance from the Guidelines, recommending just four months to be served through home monitoring. *See* Sentencing Recommendation at 2. The government believes that a below-Guideline noncustodial sentence of four months will not sever the factors articulated in section 3553.

### A. A 10-Month Custodial Sentence Is Necessary to Avoid Unwarranted Sentencing Disparity

First, and most importantly, a custodial sentence of 10 months is necessary to avoid an unwarranted sentencing disparity. Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants within similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). On January 11, 2017, the Court sentenced Stephan Florida, the first defendant in the related foreclosure bid-rigging cases, to 10 months imprisonment. *See United States v. Florida et al.*, 14-00582-005 (PJH), doc. no. 414. Stephan Florida and defendant Diaz are remarkably similarly situated. Both were brought in to the conspiracies by a family member. Both became employees of that family member's company, working under that family member's supervision and his behalf. *See United States v. Florida et al.*, 14-00582-005 (PJH), doc. no. 408 at 2-3. Both participated in the conspiracy for approximately the same amount of time and rigged approximately the same number of properties. *Compare Florida,* doc. no. 408-1 *with* Exhibit A. Both were also approximately the same age when they engaged in the bid rigging. Both had prior convictions resulting in a Criminal Category of II. *Florida*, doc. no 408 at 3. And, of course, both pleaded guilty to one count of bid rigging. Thus, there is little reason to treat them differently. Moreover, unlike Florida, Diaz's Guidelines range already reflects a downward adjustment for a minor role, making any further reduction unwarranted.

/ /

### B. A 10-Month Custodial Sentence Is Appropriate Because of the Seriousness of the Crime

The bid rigging in Contra Costa County was a serious, far-reaching crime. Defendant was a member of a criminal conspiracy that corrupted a fair and competitive process meant to compensate mortgage holders, homeowners, and other beneficiaries following a home foreclosure. The members of the conspiracy exploited that process for their personal enrichment. The total bid-rigging payoff amounts for the 26 properties where defendant suppressed competition was $157,700. This money was divided among the conspirators as the fruits of the conspiracy rather than paid to the beneficiaries. This conduct was especially harmful given its timing during the foreclosure crisis that began in 2008, when housing prices were already depressed and losses from under-water mortgages had skyrocketed. The conspiracy bred distrust in the auction process and discouraged investors outside of the conspiracy from attending the auctions to purchase foreclosed properties because of how the insiders demanded payoffs and intimidated newcomers. *See* Rubbo Decl. ¶ ¶19, 20.

The Court should impose a sentence within the Guidelines because of the need to deter the pervasive and wide-spread nature of this criminal conduct. While in comparison to Galloway's role, Diaz's is less egregious, there is nonetheless a strong public interest and deterrent effect in holding defendants such as Diaz accountable for their conduct in this scheme.

A sentence of 10 months – slightly above the midpoint of the Guidelines range – is also necessary in order to adequately account for the harm. The Sentencing Commission noted that in some bid rigging cases, "understatement of seriousness is especially likely." U.S.S.G. §2R1.1 cmt. n.6.; *id.* cmt. background ("The Commission believes that the volume of commerce is liable to be an understated measure of seriousness in some bid-rigging cases."). This is because the offense level calculation under section 2R1.1 is based upon "the volume of commerce done by [the defendant] . . . in goods or services that were affected by the violation." U.S.S.G. §2R2.1(b)(2). In bid rigging cases like this one therefore, only the winning bidder does any commerce and not those who agreed to stop or refrain from bidding even though they "contributed to harm that possibly was quite substantial." U.S.S.G. §2R1.1 cmt. n.6. For this reason, the Commission recommends that "[t]he court should consider sentences near the top of

the guideline range." *Id.* cmt. n.6.

In this case, the volume of commerce calculation only includes the properties won in the rounds; that is just 4 of the 26 properties Diaz helped rig, and none of the properties where he received an illegal payoff. Put another way, Diaz's volume of commerce accounts for just 15% of the harm he helped cause. Therefore, the great majority of defendant's criminal conduct is not reflected in the volume of commerce figure underlying the Guidelines calculation. For this reason, a sentence within the Guidelines is imperative and a sentence near the top of the Guidelines is warranted.

**C. A 10-Month Custodial Sentence Is Required to Promote Respect for the Law**

Another important consideration under section 3553 is the need for the sentence imposed to promote respect for the law. 18 U.S.C § 3553(a)(2)(A). Diaz committed this crime while on probation from a previous offense. PSR ¶ 42. In fact, just days after his conviction for a DUI, Diaz participated in his first round. *Compare* PSR ¶ 39 *with* Exhibit A. A few months later, in December of 2009, Diaz was sentenced to probation in the DUI case. PSR ¶ 39. That did not deter Diaz from continuing to participate in the bid-rigging conspiracy. Over the next year, Diaz continued to engage in the collusive conduct at the Contra Costa foreclosure sales. Week after week, day after day, Diaz continued to participate in the conspiracy, all while under probation from a previous offense. Diaz's criminal history demonstrates that alternatives to incarceration, such as fines and probation, have not been effective. Indeed, a few months after his DUI conviction, and while he was engaged in bid rigging, Diaz committed yet another crime – driving without a license – and was given a fine. PSR ¶ 40. Diaz's criminal history makes clear that a within-Guidelines, custodial sentence is necessary to promote respect for the law.

/ /

/ /

/ /

/ /

/ /

/ /

In recommending a below-Guidelines sentence[3] of four months of location monitoring, probation suggests that Diaz's criminal history is overstated because the offenses occurred when he was 20 and 21 years old and because he received a conditional sentence in which he was not formally supervised by a probation officer. PSR ¶ 104; Sentencing Recommendation p. 2. The government respectfully disagrees. Probation correctly applied Chapter Four of the Guidelines when it found a Criminal History Category II. *See* §4A1.1(d); PSR ¶ 43. The fact that Diaz committed a serious offense while on probation from a previous serious offense undercuts any suggestion that his criminal history is overstated. *See United States v. Gurinas*, 187 F. App'x 647 (7th Cir. 2006) (affirming district court's sentence of a defendant who committed fraud while on probation for petty theft, noting that the lower court properly found that the defendant's "criminal history category did not over-represent [his] criminal history because he was on probation when he committed the credit card fraud, which, the court also noted, is a very serious crime."). As discussed above, far from supporting a variance, the fact that Diaz committed the instant offense while on probation from previous offenses enhances the need for a custodial sentence within the Guidelines.

**D. A 10-Month Custodial Sentence Is Necessary to Adequately Deter Future Violations of Antitrust Laws**

Defendant should serve the entire term in custody. An important consideration for the Court is whether the punishment will adequately deter future violations of the antitrust laws. *See* 18 U.S.C. § 3553(a)(2)(B) (courts should consider "adequate deterrence to criminal conduct" in selecting a sentence). It is appropriate for the Court to consider not just specific deterrence but

[3] To the extent the PSR is suggesting a departure from Diaz's Criminal History Category under §4A1.3(b)(1) rather than a variance under §3553, the Guidelines require "reliable information to indicate that the defendant's criminal history category substantially over represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes" in order to depart from that criminal history level. *See* U.S.S.G. §4A1.3(b)(1). No such information has been presented. Moreover, the fact that Diaz committed the instant offense while on probation cuts against any such departure. *See* U.S.S.G. §4A1.3(b)(1); cmt. 3 ("A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.").

also general deterrence. Indeed, "perhaps paramount among the purposes of punishment is the desire to deter similar misconduct by others." *United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985); *see also Furman v. Georgia*, 408 U.S. 238, 343 (1972) (per curiam) (Marshall, J., concurring) ("Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment."). The need for prison sentences in antitrust crimes is also reflected in the Guidelines themselves: "It is the intent of the Commission that alternatives such as community confinement *not* be used to avoid imprisonment of antitrust offenders." U.S.S.G. §2R1.1 cmt. n.5 (emphasis added).

The background to the sentencing guideline for bid-rigging explains the Commission's intent that individuals who rig bids should ordinarily go to prison:

> [P]rison terms for these offenders should be much more common, and usually somewhat longer, than typical under pre-guidelines practice. Absent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases…in very few cases will the guidelines not require that some confinement be imposed.

*Id.* §2R.1.1, Background. Similarly, the legislative history of the Sentencing Reform Act notes that for white collar crimes, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 98-225, at 91-92 (1983) as reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

A non-custodial sentence will fail to reflect the seriousness of the crime and will inadequately provide deterrence. As the Court is well aware, the bid-rigging conduct in this case was widespread. Dozens of coconspirators carried out the bid-rigging conduct at county courthouses throughout Northern California. Incarceration is necessary to serve as a general deterrent to other real estate investors in California and elsewhere who may be tempted to enrich themselves through similar crimes. And it will promote respect for the law. "To provide for a mere slap on the wrist of those convicted of serious economic crimes, with no or virtually no time imprisoned as punishment, strikes a blow to the integrity of our criminal justice system." *United States v. Ruff*, 535 F.3d 999, 1006 (9th Cir. 2008) (Gould, dissenting). A non-custodial

sentence will not serve as a noticeable deterrent for others to commit similar crimes since the risk of a such a lenient sentence would be perceived as a minimal cost of doing business in exchange for the potential windfall from ill-gotten financial gains. Nor will it act as a specific deterrent. As previously discussed, Diaz engaged in bid rigging for over a year, while on probation from another crime. Diaz has thus demonstrated that a term of probation is not a deterrent.

## III. There Is No Basis to Vary from the Guidelines

Probation identified only one basis to vary from the Guidelines: the possibility that Diaz's criminal history is overstated. *See* PSR ¶ 104. As discussed in more detail above, the government respectfully disagrees that Diaz's criminal history provides a basis for a variance. There is likewise no other basis under section 3553 to vary from the Guidelines sentence of 6 to 12 months.

The defendant will likely argue that the Court should also consider Diaz's age at the time of the offense, the fact that a family member recruited him into the conspiracy, and the fact that he has maintained employment since the conspiracy as additional reasons to vary. But these arguments similarly do not warrant a variance. Diaz was an adult at the time of the crime. He was fully capable of making his own decisions. He knowingly and voluntarily participated in this conspiracy. Additionally, while it is true that he worked for Galloway and at Galloway's direction, there is no evidence that he was coerced into the conspiracy by his brother against his will.[4] To the contrary, as described above, Diaz was an enthusiastic and active participant in the conspiracy. Moreover, the Guidelines sentence has already been adjusted downward to account for Diaz's relatively minor role, taking into account some of these same issues.

The PSR also notes that the charges have "greatly impacted [Diaz's] life" but does not explain how or why that warrants a departure from the Guidelines. This is a truism that likely applies to nearly anyone accused of a federal crime. It is also an improper consideration. Under Section 3553(a)(2)(A), the *sentence* imposed should reflect the seriousness of the crime.

---

[4] The government is recommending the same sentence for Diaz that the Court gave to Stephan Florida, who also argued that family relationships brought him into the conspiracy. Unlike Florida, however, Diaz was brought in by his brother. The relationship between brothers is usually inherently less coercive than those between father and son.

Collateral consequences of the *charges* are not relevant. *See United States v. Musgrave*, 761 F.3d 602, 608-609 (6th Cir.2014) (finding that the district court's reliance on the fact that the defendant had been "punished extraordinarily" by "four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life" was improper, holding: "[n]one of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment.") (internal quotations and citations omitted).

Finally, Diaz may also argue that the Court should not impose a custodial sentence because he has maintained gainful employment since these charges were filed. But, again this is not an appropriate basis for a variance. *Cf.* U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").

In short, there is no basis under section 3553 to vary from the Guidelines sentence of 6 to 12 months. Furthermore, the government respectfully disagrees that Diaz's term should be served through location monitoring. As discussed above, any sentence must include a term of incarceration.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court sentence defendant Nicholas Diaz to (1) serve 10 months in prison, (2) serve three years of supervised release, (3) community service in lieu of a criminal fine, and (4) pay a $100 special assessment.

Dated: March 1, 2017

Respectfully submitted,

/s/

MICAH L. RUBBO
United States Department of Justice
Antitrust Division