Erik B. Levin, Esq. (208274 CABN)
LAW OFFICE OF ERIK B. LEVIN
2001 Stuart Street
Berkeley, California 94703
Tel. (510) 978-4778
erik@erikblevin.com

*Attorney for Defendant Nicholas Diaz*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 14-00607 PJH |
| Plaintiff, | ) | SENTENCING MEMORANDUM |
| v. | ) | |
| NICHOLAS DIAZ | ) | |
| Defendant. | ) | |

This memorandum is submitted on behalf of Nicholas Diaz with respect to his sentencing hearing, scheduled for March 8, 2017 at 2:30 p.m., on his guilty plea to violating Section 1 of the Sherman Act, codified at 15 U.S.C. § 1.

The parties all agree that Mr. Diaz's Total Offense Level is 9. The Presentence Report ("PSR") found Mr. Diaz to be in criminal history category II, due to a nearly 8-year-old misdemeanor DUI conviction, which nets an advisory sentence range of 6-12 months. Mr. Diaz and U.S. Probation both agree that criminal history category II overstates Mr. Diaz's criminal history. And Mr. Diaz moves for a downward departure with respect to his criminal history since it overstates his likelihood of recidivating. The government opposes the motion despite having stipulated that Mr. Diaz's advisory

sentencing range is 4-10 months, which is the advisory range that would apply to criminal history category I. *See* Plea Agreement ¶¶9 (Dkt. 176).[1]

Despite having stipulated to a 4-10 month guidelines range in the plea agreement, the government repeatedly argues in its sentencing memorandum that Mr. Diaz's Guidelines range should be 6-12 months. *See* Gov't Sent. Mem. (Dkt. 272) at 5:8, 5:27, 11:10-11, 12:15-16. Had Mr. Diaz violated the plea agreement in such an egregious manner, the Government would have been entitled to withdraw the plea agreement altogether. *See* Plea Agreement at ¶18. Mr. Diaz does not seek such a remedy. Instead, in light of the government's willful and repeated violation of the terms of the plea agreement, Mr. Diaz asks the Court to order specific performance of the plea agreement by the government. *See Santobello v. New York*, 404 U.S. 257 (1971) (remedies for a breach of a plea agreement were either specific performance of the agreement or rescission of the entire agreement and withdrawal of the guilty plea); *Fox v. Johnson*, 832 F.3d 978 (9th Cir. 2016) (discussing *Santobello*).

U.S. Probation ("Probation") recommends a sentence of three-years' probation with a special condition that Mr. Diaz be subject to a curfew for 4 months. The Government recommends 10 months' incarceration. The defense believes that three-years' probation is "sufficient, but not greater than necessary" 18 U.S.C. § 3553(a), under the unique facts of this case including that:

- Mr. Diaz's criminal category II overstates his likelihood that he will commit other crimes. *See* discussion at 9-12, *infra.*

- Mr. Diaz's character and history demonstrate that the offense conduct was aberrant behavior for him. *See* discussion at pages 12-14, *infra.*;

[1] Paragraph 9 states:

> The United States agrees that it will make a motion, pursuant to U.S.S.G. §3El.l, for a downward adjustment of two levels for acceptance of responsibility due to the defendant's timely notification of his intention to enter a guilty plea. **Therefore, the total Guidelines calculations result in an adjusted offense level of nine, for a jail term of four to ten months** and a fine of $20,000. The United States and the defendant agree to recommend that the Court order the defendant to pay no fine pursuant to U.S.S.G. §5El.2(e) due to the inability of the defendant to pay a fine.

- Mr. Diaz's sincere and productive post-offense efforts over the past 6 years, including the past two years of pretrial supervision to maintain stable employment, and make a positive contribution to society. *See* discussion at pages 5-6, *infra*;

- Sentencing Mr. Diaz to incarceration will result in his job loss and undermine his efforts towards rehabilitation while supervision in the community will support Mr. Diaz as he strives to be a positive member of society, son, brother, and employee. *See* discussion at 16-18, *infra.*
- Probation and the collateral consequences of his first felony conviction are sufficient to reflect the seriousness of the offense and promote respect for the law under the facts of this case. *See* discussion at 14-15, *infra.*

- Sentencing Mr. Diaz to incarceration will result in a sentencing disparity with Stephan Florida. *See* discussion at 18-19, *infra.*

**FACTS**

Mr. Diaz is 28-year old first-time felony offender who comes before the Court for sentencing on conduct that occurred more than six years ago, while he was briefly employed by his half-brother Michael Galloway's real estate company, Galloway Properties. The parties agree that Mr. Diaz was a minor participant in the offense conduct, received no proceeds from the illegal scheme, and acted under the supervision and direction of his employer at all times. PSR ¶22.

Mr. Diaz's history demonstrates that his involvement in the offense conduct was an aberration. Since leaving Galloway Properties in 2012, Mr. Diaz has developed a career of which he can be proud. It also demonstrates the impact that this case has had and will continue to have on his life. Mr. Diaz has lost an opportunity to complete his education, has sacrificed a close personal relationship, has withdrawn from coaching high school wrestling, and has had his future plans frozen as he endured the stress of this criminal investigation and prosecution for the past six years.

> Now that there is an end in sight to this case I have begun to allow myself the thoughts of having a future and making plans. I want to go back to school, if for no other reason than my own self improvement and to continue to make my family proud. I want to have a family of my own. I want to have kids and be able to provide for them and be a positive role model for them.

Letter from Nick Diaz to the Honorable Phyllis Hamilton (attached as Exhibit A at 1).

**A. Background**

Nick Diaz, who will be 29 years old in April, has been an athlete since he was a young child. PSR ¶51. He played soccer through high school, youth baseball, golf, basketball, and track. PSR ¶51. His passion has been wrestling. Beginning in the seventh grade, and continuing on until he was

injured in his first semester of college, Mr. Diaz has been passionate about wrestling. PSR ¶51. When he could no longer wrestle due to injury, Mr. Diaz began coaching wrestling.

By all accounts, Mr. Diaz has been phenomenally successful high school wrestling coach. His high school wrestling coach, Patrick Bussey, recognized Nick's potential as a coach before he even had graduated from high school. "Nick did well as a wrestler but he was also a leader on the team which is why he was chosen as a team captain. Nick has that innate ability to relate to people, communicate effectively, and help people be the best they can be." Patrick Bussey Letter (attached as Exhibit A at 6). Bussey describes Nick as "a talented athlete but more than that he displayed discipline, dedication, and a big heart." *Id.* In recognition of Nick's "character and trustworthiness" Mr. Bussey selected Nick as a Teacher's Aide in his senior year. *Id.*

Following Mr. Bussey's retirement, Oakmont High School hired Nick as head coach. Mr. Bussey couldn't have been happier. As he explains, "I searched for a replacement and wanted a coach with good values, good communication skills, and the ability to motivate young people." *Id.* "Nick did a fantastic job with our student athletes and was able to inspire them to perform way beyond expectations." *Id.* Key to Nick's success was his "big heart and compassionate nature." *Id.* Students worked hard for Nick because they realized "Nick cared about the athletes as young people in their entirety and not just their wrestling ability[.]" *Id.* Nick not only taught his students to be good wrestlers (he helped develop at least one state wrestling champion), but he also helped his students develop into adults (including the state champion who "showed immaturity in the classroom as a freshman, but who grew to be a polite you man." Letter from Dean E. Perkins (attached as Exhibit A at 8). According to Nick, "Coaching young people and helping to mold them into not only good athletes but better people is one of the things that I am most proud of." (Exhibit A at 1). As one of his former students remarked, "Nick was passionate about coaching wrestling and making a positive impact on his wrestlers in all aspects of life not just limited to wrestling." Letter from Corporal David E. Pinto (attached as Exhibit A at 13). "Nick had an extraordinarily positive impact on my life and his help is responsible for a lot of my success in the Marine Corps as well as in life in general." *Id.*

Although Nick enjoyed coaching wrestling immensely, it did not pay well and he struggled to make ends meet during his first two years of college. Between 2006 and 2009, Nick worked various retail jobs (earning between $8-10/hour). PSR ¶¶79-81. In the Summer of 2009, when his half-brother, Michael Galloway, offered him a job with his real estate company, Galloway Properties, Nick withdrew from Sierra College in Rocklin, California, relocated to the Bay Area, and began working for Galloway Properties. PSR ¶78.

**B. The Offense Conduct**

From July 2009, until June 2012, Mr. Diaz worked for his half-brother and codefendant Michael Galloway at his company Galloway Properties in Brentwood, California. PSR ¶78. From mid-2009 until January 2011, Mr. Diaz attended auctions in Contra Costa County on behalf of Galloway Properties where he participated in the rounds. *Id. at* ¶21. The government has agreed that Mr. Diaz had "a mitigating role in this offense as he participated in the conspiracy under the supervision and at the direction of Galloway. *Id.* ¶22. "There was no evidence to suggest Diaz received any of the proceeds from the illegal scheme, and participated in the offense less frequently than other members in the Contra Costa County conspiracy." *Id.*

**C. Mr. Diaz's Post Offense Conduct**

Since leaving Galloway Properties in June 2012, Mr. Diaz, in his words, "separated myself from the real estate business and began trying to make a career that I could be proud of." Nick Diaz Letter (attached as Exhibit A at 1). Several years before his initial appearance in this matter on December 17, 2014, Mr. Diaz tried to make good on that goal. He worked in landscaping from June 2012 until March 2014. PSR ¶77. And since July 2014, Mr. Diaz "chose to follow my heart and become involved in the fitness industry." Diaz Letter (Exhibit A at 1). He was hired by 24 hour Fitness as a service representative and has since been promoted to assistant sales manager for 24 Hour Fitness in San Ramon, California. PSR ¶75.

For over two years this case has been pending and it has weighed heavily on Nick and has affected virtually every aspect of his life. Nick struggled to stay productive and positive. As he writes, "These past several years have been very hard, not allowing myself to plan for the future

because I felt like I had a dark cloud looming over my head." Nick Diaz Letter (Exhibit A at 1). "I became introverted and did not feel myself." *Id.* Last year, Nick was forced to end a committed three-year relationship because of his inability to plan for the future. PSR ¶53. He also stepped away from coaching high school wrestling for fear that should the case become public it would embarrass the school. He writes that it was hard for him "to step away from the one thing that I was able to do to make the biggest impact on others. It saddens me that with a felony on my record I may never be able to coach again but that is a consequence of my past actions and I accept that." Nick Diaz Letter (Exhibit A-1). "After time for reflection and the support of friends and family I have learned to 'control the controllables.' Every day I wake up and remind myself to try and take it a day at a time and stay as positive as possible." *Id.*

Now that this case is coming to a close for Nick, he has allowed himself to plan for the future. He plans to go back to school and looks forward to having a family of his own. And he sees a future for himself with 24 Hour Fitness. He was recently "promoted to the Sales Manager position for the most financially important facility in the company." Nick Diaz Letter (Exhibit A at 1). In the near future, he hopes to be "promoted to General Manager of one of our locations and will truly be able to begin to impact a community by helping them get started with their own health and fitness goals." (Exhibit A-1). Nick writes that the case has had a profound impact on him and the way he lives his life:

> I cherish each day I have and try to take advantage of the time that I am given. I feel as if I have continued to be a positive member of the community since my involvement in this crime and want to continue to do so. I know that I will never again be part of any bid rigging scheme or involve myself with criminal activity. I just want to work hard, help others, and make my family proud.

Nick Diaz Letter (Exhibit A at 1).

## ARGUMENT

### A. The standard relevant to a sentence sufficient, but not greater than necessary.

The Supreme Court's decision in *United States v. Booker* heralded the end of the federal Sentencing Guidelines as a mandatory element of sentencing. 543 U.S. 220, 226 (2005). The threshold substantive holding was joined by a "remedial" opinion that severed the sections of the

Sentencing Reform Act ("SRA") that made the Guidelines mandatory, 543 U.S. at 244-246, and left the Guidelines themselves in place as just another of the seven considerations listed in 18 U.S.C. § 3553(a) that a sentencing court must consider in the course of determining a sentence that is, according to § 3553(a), "sufficient but not greater than necessary[] to comply with the purposes [of sentencing] set forth in" § 3553(a)(2).[2]

The Supreme Court has since emphasized that the heart of a federal criminal sentencing is the parsimony clause and the § 3553(a) factors. The Court, in *Kimbrough v. United States*, described the parsimony clause as

> an overarching provision instructing district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide

---

[2] 18 U.S.C. § 3553(a) states:

**(a) Factors to be considered in imposing a sentence.–** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider–

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed–

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for–

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines. . . .

**(5)** any pertinent policy statement–

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress . . .

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

> just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a) (2000 ed. and Supp. V).

552 U.S. 85, 101 (2007).

In *Gall v. United States*, the Court highlighted that "failing to consider the [18 U.S.C.] § 3553(a) factors" can render a sentence unreasonable. 552 U.S. 38, 51 (2007). Time and again, sentencing courts have recognized that to serve justice, the Guidelines must be tempered with a judge's common sense. *See*, *e.g.*, *United States v. Adelson*, 444 F. Supp.2d 506, 512 (S.D.N.Y. 2006) (noting "[t]he utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense").

While post-*Booker* jurisprudence has elevated the parsimony clause and the entirety of §3553(a) as central sentencing considerations, at the same time, the Supreme Court has continually reaffirmed that the Guidelines are not presumed reasonable, in part because they do not take into account all the § 3553(a) considerations. *See Gall*, 552 U.S. at 50 (a sentencing court "may not presume that the Guidelines range is reasonable"); *Rita v. United States*, 551 U.S. 338, 351 (2007) ("the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"); *Nelson v. United States*, 555 U.S.__, 129 S.Ct. 890, 891 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable") (*per curiam*).

Consistent with *Booker*, *Gall*, *Rita*, *Kimbrough*, and *Nelson* and the numerous factors enumerated in 18 U.S.C. §3553(a) (analyzed below), a sentence of three years' probation is appropriate for Mr. Diaz in this case.

**B. The Guidelines calculation and corresponding range.**

The sentencing statute requires consideration of the advisory guidelines in this case. *See* 18 U.S.C. § 3553(a)(4) and (5). The defense concurs with Probation's calculation of Mr. Diaz's sentencing guideline range under the U.S. Sentencing Guidelines § 2R1.1 (2016) [hereinafter "USSG"].

**Base Offense Level.** A violation of 15 U.S.C. § 1 carries a base offense level 12. USSG § 2R1.1(a). PSR ¶27.

**Specific Offense Characteristics.** The offense conduct involved an agreement to submit noncompetitive bids which results in a one-level increase. USSG § 2R1.1(b)(1). PSR ¶28.

**Role Adjustment.** Mr. Diaz played a minor role in the offense conduct and therefore is entitled to a two-level reduction. USSG 2E1.1(a). PSR ¶30.

**Total Offense Level.** With a two-level reduction for acceptance of responsibility, USSG § 3E1.1(a), Mr. Diaz has a total offense level 9. PSR ¶32.

**Criminal History Category.** Mr. Diaz has 3 criminal history points, resulting from his 2009 misdemeanor DUI conviction, which places him within Criminal History Category II. PSR ¶43.

**Advisory Guideline Range.** The resulting advisory sentencing guideline range is 6 to 12 months served as either (i) probation with release with home confinement, community confinement, or intermittent confinement; (ii) supervised release with home confinement, community confinement, or intermittent confinement so long as one month is satisfied with incarceration; or (iii). Incarceration. USSG § 5C1.1(c). PSR ¶86.

**Plea Agreement.** Under the terms of the plea agreement, the parties agree that the guidelines range is four to ten months. Plea Agreement ¶9 (Dkt. 176).

**C. Motion for a downward departure on Mr. Diaz's criminal history.**

The PSR calculates Mr. Diaz to be in criminal history category II because of a 2009 misdemeanor DUI conviction and the resulting term of unsupervised probation. PSR ¶43. Mr. Diaz moves for a downward departure with respect to his criminal history category to criminal history category I because his criminal history category overstates the likelihood that he will commit other crimes.

A downward departure may be warranted where "reliable information indicates that the criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." §4A1.3(b)(1). *See, e.g.*, *United States v. Shoupe*, 988 F.2d 440 (3d Cir. 1993); *United States v. Lacy*, 99 F.Supp.2d 108 (D.

Mass. 2000); *United States v. Frappier*, 377 F.Supp.2d 220 (D. Me. 2005); *United States v. Swan*, 327 F. Supp. 2d 1068 (D. Neb. 2004).

Mr. Diaz's criminal history overstates his likelihood of recidivism for two reasons. First, his prior criminal conduct occurred when Mr. Diaz was very young (age 21). In *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court declared the death penalty unconstitutional as applied to juveniles, and in doing so recognized the consensus of the country and the wealth of scientific research that juveniles are less morally culpable than adults for their crimes. The Court concluded that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult" *Id.* at 507. The Court continued along this line of cases in *Graham v. Florida*, 560 U.S. 48 (2010) (Eighth Amendment prohibits sentence of life imprisonment without parole for probation violation for offense committed while a juvenile); *Miller v. Alabama*, 132 S.Ct. 2455 (2012) (mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments); and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016) (finding *Miller v. Alabama* retroactive on state collateral review). Through these cases, the Court came to rely heavily on neuropsychological research to conclude that young people are have an inherently limited culpability and real capacity for change.

Researchers have recently begun to focus on whether there is any meaningful difference between juvenile and young adults in this regard and "have found that in young adulthood, as in adolescence, areas of the brain that regulate functions like judgment and self-control are still not fully mature." *How Should Justice Policy Treat Young Offenders?* MacArthur Foundation Research Network on Law and Neuroscience, February 2017, Vanderbilt Law Research Paper No. 17-9. [3] While there is still more research that needs to be done, researchers have concluded preliminarily at

---

3https://poseidon01.ssrn.com/delivery.php?ID=057096091031106005070102098029018072027012061042040087126089112023083011117003097070010012060033019023016099117120126079071070006005047059076008098090068027028106001045023083068087030066067069000112022097079073007123002014126084005012071017067017103&EXT=pdf

least, that "the capacity of young adults to regulate their actions and emotions appear more like that of teens than adults in their mid 20s or older." *Id.*

After *Booker*, at least one court has taken the Supreme Court's decision in *Roper v. Simmons* into account in sentencing a defendant outside the Guidelines, when the defendant's prior offense had been committed when he was a teenager. *See United States v. Naylor*, 359 F. Supp.2d 521 (W.D. Va. 2005) (sentencing defendant to non-guidelines sentence to 5½ years below the guidelines range in part because the defendant's prior offense occurred while he was a teenager), citing Roper v. Simmons, 543 U.S. 551.

Both prior to and after *Booker*, courts have routinely departed from a defendant's Criminal History Category when the prior conduct was clustered in his youth. *See United States v. Shoupe*, 988 F.2d 440, 447 (3d Cir. 1993) (court may consider defendant's age and immaturity when priors committed in determining whether the criminal history category over-represents history); *United States v. Bowser*, 941 F.2d 1019, 1024 (10th Cir. 1991) (age and close proximity in time between prior criminal acts provided proper bases to depart downward from career offender category); *see also United States v. Senior*, 935 F.2d 149, 151 (8th Cir. 1991) (downward departure from 292-365 to 120 months affirmed where defendant only 20 years old when he committed his first predicate offense and it was close in time to his subsequent predicate offense); *United States v. Brown*, 985 F.2d 478, 482 (9th Cir. 1993) (holding that court could consider defendant's age at the time he committed prior offenses); *United States v. Brown*, 903 F.2d 540, 544-45 (8th Cir.1990) (noting that while age is not ordinarily relevant in §5K2.0 departure, it may be considered under §4A1.3); *see also United States v. Abbott*, 30 F.3d 71, 72-73 (7th Cir. 1994) (remanding for consideration of §4A1.3 departure where defendant argued that priors were committed in his youth).

Moreover, this Court does not need to take a leap of faith with respect to Mr. Diaz's risk of recidivism because he has amply demonstrated that he is unlikely to re-offend. Mr. Diaz's prior criminal conduct occurred nearly eight years ago around the time of the offense conduct underlying this case. PSR ¶39. Over the past 6 years, as Mr. Diaz passed from his early 20s into his late 20s, he has had no problems following the law. He has maintained employment, and positive relationships

and sought to make a positive contribution to society. Clearly, Mr. Diaz has gotten the message. His criminal history overstates his likelihood of recidivating and the Court should downwardly depart to criminal history category I.

**D. The Court should sentence Mr. Diaz to 3 years' probation.**

Three-years' probation is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), under the unique facts of this case.

**1. The nature and circumstances of the offense and Mr. Diaz's history and characteristics demonstrate that this was aberrant behavior for him and militate in favor of probation.**

As noted above, Mr. Diaz's involvement in the offense conduct occurred nearly 6 years ago and, as reflected in the 15 letters of support (collectively attached as Exhibit A), this was aberrant behavior for him. The letters of support from family members, long-term friends, former coaches, and students whom Nick coached at the high school level all paint a similar picture: Nick is a deeply compassionate, respectful, responsible, and upstanding individual who strives to make his family proud and to contribute to his community. He has been deeply affected by this case and is remorseful.

Nick's mother describes him as honest, empathetic, and generous. *See* Cynthia Diaz Letter (Exhibit A at 2). And his father describes him as "respectful, caring, loving, responsible and easy going." Manuel Diaz Letter (Exhibit A at 4).

His coach and mentor, Patrick Bussey, "I can assure you that this alleged violation of the law is not who Nick is. Nick is a responsible young man, respectful, and caring. He has a great big heart and cares deeply for his friends and family. Knowing Nick the way I do, I know this situation is tearing him apart inside and he is very remorseful for his actions. This is a good young man, who, in reality, actually stands for everything that is right with young people today. He is honest, hardworking, and has tremendous integrity." Patrick Bussey Letter (Exhibit A at 6).

David Pinto, relays how, as his wrestling coach, Nick helped his resolve personal issues he was facing with family. David Pinto Letter (Exhibit A at 13). David writes that "Nick had an

extraordinarily positive impact on my life and his help is responsible for a lot of my success in the Marine Corps as well as in life in general." *Id.*

Nick's older sister, Jessica Lawrence, describes him as "one of the most compassionate, family oriented, and hardworking young men I know." Jessica Lawrence Letter (Exhibit A at 7) According to Jessica, Nick "is extremely sorry for what he did. I know that he has felt plagued by that choice for years now and he is so young but has truly understood the gravity of the situation. Nick really needed some better guidance in his life and he has since found that in church and in his new career." *Id.* His sister, Gabriella Diaz, describes Nick as having the "will to live a humble and simple life of servitude. . . . Believe me when I say that this situation has humbled him." Gabriella Diaz Letter (Exhibit A at 12).

His cousin, Carissa Estrada, describes Nick as a "spirited and talented person" who is deeply connected to his family. Carissa Estrada Letter (Exhibit A at 9). According to Carissa, "if leniency is shown to Nick . . . he will not take it for granted" (*Id.* at 10). "Nick understands the wrong choices he made, desires to rectify his actions, is remorseful for those actions, and regrets letter me and his family down." (*Id.* at 10-11).

His friend, Daniel Harrison, describes Nick as "one of the most hardworking and driven people that I know[.]" Daniel Harrison Letter (Exhibit A at 14). Daniel writes that "there is nothing more that he wants than to put this mistake in his past." *Id.* "He stands before you a changed person; one that knows what he has done was wrong. This process has made him stronger and in turn, a better person." *Id.* Another friend, Jeff Rizzo, describes Nick as kind, hardworking, and sincere. Jeff Rizzo Letter (Exhibit A at 19).

His cousin Jonathan Almaraz writes that "Nick has always demonstrated a great sense of honest compassion and love for his family and friends. I always knew, without any reservation, that he would do anything in his power to help his family, above and beyond any expectation." Jonathan Almaraz Letter (Exhibit A at 15).

His aunt, Teresa Diaz, describes Nick as a "respectful and delightful young man" and "the one in the crowd that is always willing to lend a helping hand without needing to be asked." Teresa

Diaz Letter (Exhibit A at 16). And his uncle, James Diaz, describes Nick as someone who "get[s] along with everyone in a positive way" and is "sensitive and emotional" James Diaz Letter (Exhibit A at 17).

The Court can also look to Nick conduct while under court supervision in this matter (or even from the time he left Galloway Properties in 2012. Mr. Diaz has been successful in his efforts to be productive and positive even while the dark cloud of this case hung over him and made his future uncertain. PSR ¶¶75-77. His efforts reflect a deep desire to do better. Appropriate supervision may help Mr. Diaz reach his goals; Incarceration will cost him his job.

Since *Booker*, courts have weighed the defendant's noble qualities against the offense conduct in fashioning a sentence that is sufficient, but not greater than necessary even in cases where the offense conduct was far more egregious than Mr. Diaz's. *See, e.g., United States v. Santoyo*, 493 F. Supp.2d 1075 (E.D. Wisc. 2007) (court imposed 138-month sentence in a cocaine distribution case notwithstanding defendant's career offender and guidelines sentence of 188-235 months, in part, because support letters revealed "significant positives in his character and background which the guidelines did not take into account"); *United States v. Adelson*, 441 F. Supp.2d 506 (S.D.N.Y. 2006) (court imposed 42-month sentence, despite a guidelines recommendation of a life sentence, in part, because of the defendant's past integrity and good deeds).

**2. A probation sentence for Mr. Diaz will promote respect for the law.**

While the offense was a serious one, it was not a crime of violence, and therefore prison is generally considered inappropriate. *See* 28 U.S.C. § 994(j) (directing the Sentencing Commission to ensure the guidelines reflect that prison is generally inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," while some term of imprisonment is generally appropriate for "a person convicted of a crime of violence that results in serious bodily injury").

A non-prison sentence, particularly one in which the offender is required to do the hard work of grappling with problems that placed him at risk of criminal activity, represent significant restraints on a person's liberty. *See Gall v. United States*, 552 U.S. 38, 48 (2007). Offenders on

probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Offenders who are not imprisoned (whether it be a in a prison or by way of home confinement) are punished; they simply face a different form of punishment. A non-prison sentence does not send a message that "crime pays" or that the offense is not serious. It merely reflects that the defendant need not be incapacitated to protect public safety, and that incarceration may undercut efforts to protect the public because the offender may return to the community without addressing the issues that placed him at risk of criminal activity in the first instance.

Moreover, probation is punitive and carries long-lasting consequences. *See, e.g., Gall,* 552 U.S. at 48-49 and n.4 ("Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty.") Indeed, even the mere fact of federal conviction entails significant punishments including the emotional stress of a criminal investigation, prosecution, conviction, and sentencing. *See United States v. Braun*, 382 F. Supp. 214, 215 (S.D.N.Y. 1974) (noting the "unique agonies under the emotional stress of criminal prosecution" are real, not "trivial"); and the stigma of forever being labeled an "offender."

Nor do harsher sentences promote respect for the law. Public opinion polls also reveal that punitive sentences are not necessary to promote respect for the law or appropriately punish. *See* Judge James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 Harvard L. & Pol'y Rev. 173, 175 (2010) ("The median juror recommended sentence was only 19% of the median Guidelines ranges and only 36% of the bottom of the Guidelines ranges.").[4] Close to three-quarters (72%) of adults surveyed in 2003 either completely agreed or mostly agreed that "[t]he criminal justice system should try to rehabilitate criminals, not just punish them." Bureau of Justice Statistics, U.S. Department of Justice, *2003 Sourcebook of Criminal Justice Statistics* 139, Table 2.46.[5]

---

[4]*Available at* http://hlpronline.com/wp-content/uploads/2010/02/gwin_jurorsentinment.pdf.

[5]*Available at* http://www.albany.edu/sourcebook/pdf/t246.pdf. Three years later, close to two-thirds (65%) of those surveyed believed that "more money and effort should go to attacking the social and economic problems that lead to crime through better education and job training" than to "deterring

**3. Incarceration does little to further general deterrence.**

While it is unproductive (and, as noted above, even counterproductive) to incarcerate Mr. Diaz in pursuit of specific deterrence, there is little reason to believe that it would serve the goals of general deterrence either. Pervasive among those creating criminal justice policy is the belief that more severe sentences serve as a general deterrent to crime. Research, however, refutes this theory. As one criminologist concluded there is "no real evidence of a deterrent effect for severity." Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010). Lengthy sentences do not provide meaningful deterrence because most offenders do not think about the criminal consequences of their actions. *See* Anthony N. Doob & Cheryl Marie Webster, 30 Crime & Just. 143, 182-83 (2003).[6] To the extent that offenders weigh the perceived costs and benefits, "in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity." Pasternoster, *supra*, at 812; Doob & Webster, *supra* at 189 ("no consistent and plausible evidence that harsher sentences deter crime").

**4. Incarceration does not further specific deterrence.[7]**

Probation recognizes that Mr. Diaz may benefit from supervision. PSR at 24-25. Probation has recommended several rehabilitative services for Mr. Diaz, including drug testing. *See* PSR at 24. Mr. Diaz has no objection to many of these conditions, although he does believe that location monitoring is unnecessary in light of his compliance with pretrial services over the past two years. While rehabilitative services will aid Mr. Diaz, incarceration will not.

---

crime by improving law enforcement with more prisons, police and judges." Bureau of Justice Statistics, U.S. Department of Justice, *Sourcebook of Criminal Justice Statistics Online, Attitudes Toward Approaches to Lowering the Crime Rate in the United States*, Table 2.0013.2006, available at http://www.albany.edu/sourcebook/pdf/t200132006.pdf.

[6]*See generally* Paul H. Robinson & John M. Darley, *The Role of Deterrence in the Formulation of Criminal Law Rules: At its Worst When Doing its Best*, 91 Geo. L. J. 949, 953 (2003); A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Legal Stud. 1, 4-7 (1999).

[7]This argument is based on the testimony presented on behalf of the Office of the Federal Defender to the Sentencing Commission.

The consequences of incarceration cannot be overstated. As the Supreme Court, itself, has freely acknowledged: "[p]risons are dangerous places." *Johnson v. California*, 543 U.S. 499, 515 (2005). The facts that the federal facilities are overcrowded makes them that much more dangerous. By the end of Fiscal Year 2011, "[t]he system-wide crowding level in BOP facilities is estimated to climb to 43 percent above rated capacity," a 7% increase from the previous year. *See* U.S. Dep't of Justice*, Federal Prison System FY 2011 Performance Budget*, at 3. As a result of this crowding, "as of May 2009, 18,630 (93 percent) high security inmates were double bunked, and 14,180 (26 percent) of medium security inmates and almost 35,000 (81 percent) of low security inmates were triple bunked." *Id*. at 2. The Office of Inspector General recently listed the prison overcrowding and the attendant safety and security issues as the top challenge facing the Department of Justice. *See* Memorandum to Attorney General Eric Holder from Inspector General Michael Horowitz, dated November 10, 2014, *Available at* http://www.justice.gov/oig/challenges/2014.htm

Incarceration also causes psychic harms and has multiple "criminogenic" effects.[8] "The adaptation to imprisonment is almost always difficult and, at times, creates habits of thinking and acting that can be dysfunctional in periods of post-prison adjustment . . . . [F]ew people are completely unchanged or unscathed by the experience."[9] The psychological consequences of imprisonment "may represent significant impediments to post-prison adjustment. They may interfere with the transition from prison to home, [and] impede an ex-convict's successful re-integration into a social network and employment setting" *Id.*

---

[8]*See*, *generally*, Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 614-16 (2007); *see also* USSC, Staff Discussion Paper, *Sentencing Options under the Guidelines* 19 (1996) (recognizing imprisonment has criminogenic effects including: contact with more serious offenders, disruption of legal employment, and weakening of family ties).

[9]Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment* 4 (2001), http://aspe.hhs.gov/hsp/prison2home02/haney.pdf.

Moreover, with respect to Mr. Diaz, incarceration would mean he would lose his job and be forced to rebuild his career following his release from prison. As the Court well knows, it is exceedingly difficult for convicted felons to obtain quality employment. And unemployment and underemployment have serious criminogenic consequences.

**5. Sentencing Mr. Diaz to probation will avoid sentencing disparity.**

The government has argued that sentencing Mr. Diaz to probation will result in a sentencing disparity with Stephan Florida, who was sentenced to 11 months' incarceration. A comparison of Mr. Diaz to Mr. Florida reveals otherwise. As an initial matter, counsel is not privy to Mr. Florida's plea agreement or presentence investigation report and so is unable to uncover all of the ways in which Mr. Florida's case is different from Mr. Diaz's. Despite the inability to review all the materials (as the government can) counsel has identified several ways in which the two cases are markedly different. These difference prove that a disparity would result (and a grave injustice would be done) if the Court were to treat Stephan Florida and Nick Diaz in similar manner (as the government now proposes):

1. The government agreed that Mr. Diaz is entitled to a minor role adjustment; Mr. Florida received no such adjustment. *United States v. Stephan* Florida, 14 Cr. 582 PJH, Govt Sent. Mem. (Dkt 408) at 3:26;

2. Mr. Florida's total offense level was 11; Mr. Diaz's is 9. *United States v. Stephan* Florida, 14 Cr. 582 PJH, Govt Sent. Mem. (Dkt 408) at 3:26;

3. Nick Diaz, even before being prosecuted in this case, obtained and kept lawful employment while Stephan Florida "when released into the community before trial . . . was caught not once, but twice trafficking in tens of thousands of pills of highly addictive prescription drugs, resulting in his prosecution in a separate case" *United States v. Stephan* Florida, 14 Cr. 582 PJH, Govt Sent. Mem. (Dkt 408) at 6:5-9. According to the complaint in Stephan Florida's separate case, the police searched Stephan Florida's residence in February 2015 and recovered 445 oxycodone pills, 22,996 Xanax pills, 478.1 g of marijuana, a loaded handgun registered to Stephan Florida, as well as a digital scale and over $70,000 in cash. Dkt 1. Additionally, in December of that year

Stephan Florida was again arrested along with his codefendant in the drug case and was found to be in possession of over 45,000 Xanax pills. Dkt 96. The court revoked Stephan Florida's pretrial release as a result of the new arrest and he was sentenced to 14 months' incarceration. Dkt 110.

**Conclusion**

For the foregoing reasons, it is respectfully requested that the Court sentence Mr. Diaz to three-years' probation.

DATED this 1st day of March, 2017.

.

Respectfully submitted,

By /s/ Erik B. Levin

Erik B. Levin (Bar No. 208274)
LAW OFFICE OF ERIK LEVIN
2001 Stuart Street
Berkeley, California 94703
Tel. (510) 978-4778
Fax (510) 978-4422
erik@erikblevin.com

*Attorney for Defendant Nicholas Diaz*

## Certificate of Service

I hereby certify that on March 1, 2017, I filed the foregoing **Defense Sentencing Memorandum** with the Clerk of the United States District Court for the Northern District of California by using the CM/ECF system.

I also emailed a copy of the foregoing to United State Probation Officer Karen L. Mar.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 1, 2017.

*s/Erik B. Levin*
Erik B. Levin, Esq.