MICAH L. RUBBO (CSBN 267465)
ALEXIS J. LOEB (CSBN 269895)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
San Francisco, CA 94102
micah.rubbo@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN MICHAEL GALLOWAY,<br><br>Defendant. | Case No. CR 14-00607 PJH<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: March 15, 2017<br>Time: 2:30 p.m.<br>Court: Honorable Phyllis J. Hamilton |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

PROCEDURAL BACKGROUND .......... 1

FACTUAL BACKGROUND .......... 1

I. Galloway's Professional Background .......... 2

II. Galloway's Role in the Conspiracy .......... 2

A. Galloway Directly Supervised Another Participant: Nicholas Diaz .......... 3

B. Galloway Led and Organized Rounds .......... 3

C. Galloway Recruited Others Into the Conspiracy .......... 4

D. Galloway Intimidated Outsiders to the Conspiracy .......... 4

E. Galloway Recruited Others Into the Conspiracy .......... 5

SENTENCING GUIDELINES AND RECOMMENDED SENTENCE .......... 6

I. Guideline Calculations .......... 6

A. Galloway Should Receive A Three-Level Upward Adjustment for His Role as a Manager or Supervisor .......... 6

B. Fine and Restitution .......... 9

II. Sentence of 24 Months Is Reasonable And Appropriate .......... 10

A. A 24-Month Custodial Sentence Is Necessary to Adequately Deter Future Violations of Antitrust Laws .......... 10

B. A 24-Month Custodial Sentence Is Appropriate Because of the Seriousness of the Crime .......... 14

C. A 24-Month Custodial Sentence Is Necessary to Avoid Unwarranted Sentencing Disparity .......... 15

CONCLUSION .......... 17

## TABLE OF AUTHORITIES

**CASES**

*Furman v. Georgia*,
408 U.S. 238 (1972) ..... 12, 13

*United States v. Barker*,
771 F.2d 1362 (9th Cir. 1985) ..... 12

*United States v. Barnes*,
993 F.2d 680 (9th Cir. 1993) ..... 7

*United States v. Carter*,
560 F.3d 1107 (9th Cir.2009) ..... 16

*United States v. Koenig*,
952 F.2d 267 (9th Cir. 1991) ..... 7, 8

*United States v. Musgrave*,
761 F.3d 602 (6th Cir. 2014) ..... 16

*United States v. Ruff*,
535 F.3d 999 (9th Cir. 2008) ..... 13

*United States v. Varela*,
993 F.2d 686 (9th Cir. 1993) ..... 8

*United States v. Woodbury*,
71 F. App'x 698 (9th Cir. 2003) ..... 8

**STATUTES**

15 U.S.C. § 12 ..... 6

18 U.S.C. :

§ 3553(a) ..... 10
§ 3553(a)(2) ..... 10
§ 3553(a)(2)(A) ..... 16
§ 3553(a)(2)(B) ..... 12
§ 3553(a)(2)(C) ..... 10
§ 3553(a)(6) ..... 15
§ 3583(d) ..... 10
§ 3663 ..... 10
§ 3663(a)(3) ..... 10

**FEDERAL RULES**

Federal Rule of Criminal Procedure 11(c)(1)(A)............................................................. 1

U.S.S.G. :

§2R1.1 ........................................................................................................ 6, 13, 14

§2R1.1(c)(1)................................................................................................. 9

§2R2.1(b)(2)................................................................................................ 14

§3B1.1 ........................................................................................................ 7, 8

§3B1.1(b) ........................................................................................... 6, 7, 8, 9

§3E1.1(a)..................................................................................................... 9

§3E1.1(b) ..................................................................................................... 9

§5H1.11...................................................................................................... 16, 17

**OTHER AUTHORITIES**

S. Rep. No. 98-225 (1983)....................................................................................... 13

## INTRODUCTION

Defendant John Michael "Mike" Galloway was one of the ringleaders of a multi-year conspiracy in which real estate investors, who were not content to pay rock-bottom prices for foreclosed houses in the midst of the great recession, sought to make even more money by rigging the bids for those already depressed houses and paying each other off. Galloway has timely pleaded guilty to the crime, yet his submissions to the Probation Office make clear that, even today, he refuses to truly accept complete responsibility for his actions, downplaying and outright denying some of his most egregious conduct. The United States respectfully requests that this Court sentence defendant Galloway to (1) serve 24 months in custody, (2) serve three years of supervised release, (3) a fine of $74,899, and (4) pay restitution in the amount of $256,050, and (5) pay a $100 special assessment. This sentence is consistent with the parties' Federal Rule of Criminal Procedure 11(c)(1)(A) and (B) plea agreement.

## PROCEDURAL HISTORY

On December 3, 2014, a grand jury sitting in the Northern District of California returned an indictment charging defendant and four coconspirators – Nicholas Diaz, Charles Rock, Thomas Joyce, and Glenn Guillory – with a conspiracy to rig bids in violation of the Sherman Act. Rock originally pleaded guilty on December 24, 2014 and entered a new plea agreement on October 19, 2016. Diaz and Galloway pleaded guilty on November 16, 2016. Diaz's sentencing is scheduled for March 8, 2017. Joyce was convicted on February 6, 2017 and is scheduled to be sentenced on May 10, 2017. Guillory is scheduled for trial on April 10, 2017.

## FACTUAL BACKGROUND

As discussed in greater detail below, Galloway was a ringleader and one of the most aggressive participants in the Contra Costa bid-rigging conspiracy. Having shadowed another ringleader of the bid rigging conspiracies, Michael Marr, for a number of years, Galloway understood how much money could be made through the bid-rigging conspiracy and how the conspiracy worked. And indeed, in just over two years, Galloway rigged the bidding for at least 275 homes, resulting in $1,512,253 in illegal payoffs to and from his coconspirators. Galloway personally raked in $250,400 in illegal payoffs. A chart identifying these transactions is attached

as Exhibit A. Along the way, he recruited new members of the conspiracy, cajoled competitors into agreeing not to bid, and instigated and organized the rigging of property after property.

## I. Galloway's Professional Background

Galloway is a real estate investor and licensed broker who purchased properties at the Contra Costa foreclosure auctions. Although he originally worked for coconspirator Michael Marr, Galloway started his own company in 2009. Declaration of Special Agent Deborah Bond ("Bond Decl.") ¶¶ 2-3. Galloway formed Galloway Properties, LLC, and Equity Fund, LLC, with his business partner James Campos to purchase properties at foreclosure sales and fix the properties up for resale. *See id.* at ¶¶ 4-5. In mid-2009, Galloway also hired his brother, codefendant Nicholas Diaz, to be his representative at the foreclosure sales and in rounds. Over the course of the next two years, Galloway purchased over seven million dollars' worth of rigged real estate.

Galloway and his brother became a fixture at the Contra Costa foreclosure sales. Galloway's organization was represented at the sales on a regular basis. *Id.* at ¶¶ 6-8. And from June 2008 to January 2011, Galloway was involved in rounds and payoff agreements just as frequently.

## II. Galloway's Role in the Conspiracy

Galloway was one of the leaders of the Contra Costa bid-rigging conspiracy. Witnesses describe him as being a "big fish," a "major player," and "notorious." PSR ¶ 19. Galloway had many important roles in the conspiracy. One witness describes Galloway's roles in the conspiracy in this way:

> Galloway negotiated rounds, led rounds, intimidated people to drop out of public auctions, threatened to drop property on people if they continued to bid, and kicked people out of rounds if they did not have sufficient funds to pay for the property.

Bond Decl. ¶ 9. As described below, he recruited outsiders into the conspiracy and punished bidders who refused to cooperate. To accomplish these goals, he was loud and aggressive and made sure that the coconspirators played by his rules. He also directly controlled and supervised another conspirator: his brother codefendant Nicholas Diaz.

**A. Galloway Directly Supervised Another Participant: Nicholas Diaz**

In mid-2009, Galloway hired his younger brother, codefendant Nicholas Diaz, to represent him and his company at the Contra Costa foreclosure auctions and in the rounds. PSR ¶ 19. Galloway, who had been participating in the conspiracy for at least a year before he brought Diaz into the conspiracy and directed him to participate on his behalf. Diaz and Galloway sometimes attended the auction together, each taking a "seat" in the round. Bond Decl. ¶¶ 11-14. This arrangement allowed Galloway to make more money when he or Diaz lost the round. *Id.* at ¶ 15. It also meant that he had to pay out less when he purchased the property in the round. *Id.* at ¶ 16. Other times, Diaz attended without Galloway. When Diaz was at the auction by himself, Galloway directed him over the phone and told him what to do. *Id.* at. ¶¶ 10, 17-21. Galloway directed Diaz on how much to bid in the public auction, whether to agree not to bid or to stop bidding, whether to participate in a round, and how much to bid in the round. *Id.* Witnesses recall hearing Galloway yelling at Diaz through the phone. *Id.* One witness even described Diaz as a "puppet" of Galloway. *Id.* at ¶ 17. The audio/video recordings made by the undercover agent corroborate these witness statements. In these recordings, Diaz can be seen in the rounds using a telephone headset. Diaz reports on the bidding in the round, waits for direction, and then reports to the round participants whether he will bid or drop out of the round. PSR ¶ 20. Bond Decl. ¶ 22.

**B. Galloway Led and Organized Rounds**

Galloway also frequently organized and led rounds on his own. Witnesses recall that Galloway was very aggressive about making sure that there was a round on nearly every property. Bond Decl. ¶¶ 9, 23-24. He was frequently the one to approach the other coconspirators at the public auction to ask them to stop or refrain from bidding. *Id.* at ¶¶ 25-27. Galloway usually decided who would be allowed in the round. He also frequently then led those rounds – acting as the auctioneer of the private auction; taking each coconspirator's bid and recording it on the round sheet. *Id.* at ¶¶ 23-24, 28. This was not a "subjective characterization" (as Galloway argued in his objections to the draft PSR), but rather an objective and consistent

//

observation of several percipient witnesses who participated in the conspiracy. *See id.* at ¶¶ 23-28; PSR ¶ 21.

**C. Galloway Recruited Others Into the Conspiracy**

Galloway also frequently recruited new bidders into the conspiracy. Many of the coconspirators recall that they were introduced to the conspiracy by Galloway. For example, defendant Charles Rock describes Galloway recruiting him into the conspiracy this way:

> The first time Rock agreed to participate in a round was for a property located in Danville that Rock was bidding for during an auction. Galloway, Miguel DeSanz, and one other person qualified to bid. Galloway approached Rock and said something similar to, "Why bid against us? We can work it out instead of us bidding you up. . . . After agreeing to participate in a round the bidding stopped. Rock won the public auction. After the public auction Rock walked with Galloway across the street to a McDonald's restaurant. As Rock and Galloway walked across the street, Galloway explained the process of a round to Rock as each person in the round would bid in turn in identical increments until all bidders dropped out of the round.

Bond Decl. ¶ 29. Coconspirator Grant Alvernaz also describes how Galloway first introduced him to the conspiracy:

> Galloway went up to the bidders and made statements similar to "hey, we are all looking at the same property. Why bid each other up. Let me buy it and we will just have a round." As soon as Galloway was comfortable that Alvernaz was not involved in law enforcement, Galloway explained to Alvernaz how rounds were conducted. Although Galloway did not explicitly state that rounds were illegal, Alvernaz believed Galloway was aware rounds were illegal.

*Id.* at ¶ 30. Coconspirators Joseph Vesce and Hilton Wong have similar stories. *Id.* at ¶¶ 31-32.

**D. Galloway Intimidated Outsiders to the Conspiracy**

Galloway also intimidated and cajoled other bidders to participate in the conspiracy. Several witnesses recall how Galloway would intentionally harass any bidder who refused to take part in the collusion. For example:

> Heisner and Galloway intentionally harassed a bidder named Mary Issacson. . . . She was never willing to cooperate with Heisner and Galloway and in retaliation they frequently bid her up at auctions. Other

> bidders who did not typically cooperate with the group of colluding bidders included Dave Hansen and Will Last Name Unknown (LNU) (who bids for a company called Blue Mountain), and an Asian male named Desmond LNU. Galloway once yelled out loud while Desmond was bidding. Galloway yelled something similar to, "Don't let him [Desmond] have it!"

*Id.* at ¶ 33. Thomas Bishop also describes this tactic of trying to drive up the price of a property for anyone who refused to participate in rounds. *Id.* at ¶ 34. Bishop recalls that Galloway was one of the conspirators who used this tactic. *Id.* Several other witnesses describe similar incidents. *Id.* at ¶ 35 (Rock recalls that Galloway threatened to continue bidding against an unidentified man during an auction of a property until he paid Galloway for a round conducted for a different property); ¶ 36 (Legault recalls that Galloway demanded money from some new-comers to the auction); ¶ 37 (Slipper recalls Galloway used a cell- phone jammer to interrupt the signal of an outsider named Clark); ¶ 38 (Heisner recalls Galloway would lose money to spite other bidders if other bidders refused to follow what Galloway wanted them to do.); ¶ 39 (Renquist recalls that Galloway sometimes bullied people into agreeing to pay him to stop bidding during an auction).

**E. The Bid Rigging of 70 Holiday Drive in Alamo**

One incident in particular exemplifies Galloway's role in the conspiracy. At the auction for 70 Holiday Drive, Alamo, Galloway and two other conspirators threatened to keep bidding against a woman named Penny Pickett and her assistant Roberta White, aka Bobbie White, unless she paid them $100,000. Bond Decl. ¶¶ 40-41. Galloway was central to the negotiations. White recalls that during the auction, Galloway reached out and took a cashier's check out of the envelope White was holding in her hand to qualify (after qualifying) to purchase the property. *Id.* at ¶ 41. He looked at the cashiers' check and indicated that the amount of the check, $100,000, was enough to stop the bidding. *Id.* Pickett and White ultimately agreed to pay. Galloway then met Pickett and White at the bank to ensure that the group received its $100,000 payoff. Greg Pickett, Ms. Pickett's husband, obtained a cashier's check for $100,000 and handed it to Galloway. *Id.* at ¶¶ 40-41. Galloway went back to the McDonald's where auction participants typically gathered and bragged about the event. *Id.* at ¶ 47. Galloway then divided

the winnings with his coconspirators, but claimed a larger share because he had to do the "dirty work." *Id*. at ¶ 42.

The bid rigging deal that Galloway negotiated with Pickett and White became infamous, both because of the amount of the payoff and the brazen role Galloway played. In addition to White and Pickett, eight other coconspirators witnesses recall this event. *Id*. at ¶¶ 40-49 (Ditmer, Barta, Bishop, Vesce, Wong, Slipper, Renquist, and Powers). Galloway himself bragged about the event to several people. *Id*. ¶ 47. Galloway now conveniently recasts this event, claiming to have simply been in the wrong place at the wrong time. *See* PSR ¶ 19.

## SENTENCING GUIDELINES AND RECOMMENDED SENTENCE

### I. Guidelines Calculations

The base offense level for a violation of Section 1 of Title 15, United States Code, is 12. *See* PSR ¶ 28; U.S.S.G. §2R1.1. In paragraph 8 of the plea agreement, the parties have stipulated to a volume of commerce of $7,489,862. Thus, the PSR correctly finds that the base offense level should be increased one level for the submission of noncompetitive bids and two levels for a volume of commerce of more than $1,000,000 but less than $10,000,000. *See* PSR ¶¶ 29-30; U.S.S.G. §2R1.1(b)(1), (b)(2)(A).

The parties did not reach an agreement as to whether Galloway should receive an upward adjustment for his role in the offense. Probation recommends that he should receive an upward adjustment of three points because the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive. *See* PSR ¶ 32; U.S.S.G. §3B1.1(b). The government agrees.

#### A. Galloway Should Receive A Three-Level Upward Adjustment for His Role as a Manager or Supervisor

Galloway should receive an additional three points because he was a manager or supervisor of the conspiracy. Section 3B1.1(b) provides: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive the offense level should be increased by 3 levels." U.S.S.G. §3B1.1(b). The commentary to §3B1.1 provides guidance regarding the appropriate

application of §3B1.1, finding the following factors relevant: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. U.S.S.G. §3B1.1, Application Note 4.

Galloway's role in the conspiracy falls squarely within the definition of "a manager or supervisor" for two reasons. First, Galloway directly supervised another participant in the conspiracy. Second, Galloway had a leadership role in the conspiracy as a whole.

1) <u>Galloway Directly Supervised Codefendant Nicholas Diaz</u>

In order to draw a three-level upward adjustment under §3B1.1(b), a defendant need only have managed or supervised one other participant involved in the commission of the crime. *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993). Although §3B1.1(b) requires that there be at least five participants, "there is no requirement . . . that the defendant exercise authority over at least five participants before the enhancement can be applied." *Id.* at 685 (citation omitted). A defendant manages or supervises another if he exercises "some degree of control or organizational authority" over that person. *United States v. Koenig*, 952 F.2d 267, 274 (9th Cir. 1991). Here, there is no dispute that there are at least five participants in this case. The question then is whether Galloway exercised some degree of control over at least one other participant in the commission of the crime. He did.

Defendant Galloway directly supervised and controlled his employee and codefendant Nicholas Diaz. As described above, Diaz was on the phone taking orders from Galloway during the agreement at the public auction and during the round. PSR ¶¶ 19-21. Diaz could not enter into an agreement at the public auction without first getting authority from Galloway. Diaz could not bid at the public auction without first getting authority from Galloway. And Diaz could not bid in the round without first getting authority from Galloway. Bond Decl. ¶ 21. The audio/video recordings made by the undercover agent corroborate this witness testimony. PSR ¶ 20. In these recordings, Diaz can be seen in the rounds using a telephone headset. Diaz reports

on the bidding in the round, waits for direction, and then reports to the round participants whether he will bid or drop out of the round. *Id*. at ¶ 22. Diaz did not keep any of the proceeds from the round – he turned them all over to Galloway. *See* PSR ¶ 22. In summary, as the PSR observed, "Diaz attended the auctions on behalf of [Galloway Properties], and participated in rounds at Galloway's direction." *Id.* at ¶ 19.

Galloway's supervision and control over Diaz is itself sufficient to establish that he was a manager or supervisor of the conspiracy under U.S.S.G. §3B1.1(B).

2) <u>Galloway Was a Leader in the Bid-Rigging Conspiracy in Contra Costa County</u>

Galloway was also a leader in the bid-rigging conspiracy as a whole. Under U.S.S.G. § 3B1.1, an enhancement may be proper where "a defendant organizes others in the commission of the criminal activity even though he does not retain a supervisory role over the other participants. The enhancement reflects the greater level of culpability of the participant who arranges the transaction." *United States v. Varela,* 993 F.2d 686, 691–92 (9th Cir. 1993) (finding an upward adjustment under §3B1.1 proper where a defendant "coordinate[ed] the activities of the other participants to the extent necessary to complete the transaction"); *see also United States v. Woodbury*, 71 F. App'x 698, 698–99 (9th Cir. 2003) (affirming a three-level upward adjustment even though defendant did not exert complete control over others, where defendant instructed others on transferring funds, often compensated them, and on at least one occasion provided transportation); *Koenig*, 952 F.2d at 274 (affirming a three-level adjustment when the defendant "played some role in educating and directing the group").

Galloway frequently organized and directed other participants in the Contra Costa conspiracy and led the rounds. Bond Decl. ¶¶ 8-9. Witnesses also recount that Galloway decided and enforced the rules of the conspiracy, claiming to be able to decide who participated in the rounds and when money would be due. *Id.* ¶¶ 9, 57. He also aggressively recruited others in the conspiracy, threatening to outbid anyone who would not agree to stop bidding at the public auction and participate in rounds. *Id.* ¶¶ 34, 40. He was often the first person to approach new

//

bidders to the Contra Costa auction, inviting them into the conspiracy and teaching them the rules. *Id.* ¶¶ 29-32.

The remaining factors identified in Commentary Note 4 further support the application of 3B1.1(b) in this case. Galloway exercised decision-making authority, recruited others, and participated in organizing the offense. He also claimed a larger share of the fruits of the crime. Witnesses describe how Galloway demanded multiple "seats" in a round, which allowed him to be paid twice as much for each round. Finally, the nature and scope of Galloway's participation also warrants an upward adjustment. He participated for over two years, rigged hundreds of properties, and helped to deprive the beneficiaries of over a million dollars. His conduct was brazen and aggressive, making him one of the most notorious members of the Contra Costa conspiracy. Bond Decl. ¶¶ 58-60.

In short, the evidence is overwhelming that Galloway was a "manager or supervisor" of the Contra Costa conspiracy. It is undisputed that he directed codefendant Diaz's participation.[1] Additionally, Galloway exercised control over the rules, participants, and fruits of the bid-rigging conspiracy itself. Therefore, §3B1.1(b) is applicable.

Thus, after a three-level adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a), (b), the total offense level is 15. *See* PSR ¶ 32. With a criminal history category of I, the advisory sentencing range is 18 to 24 months. The government recommends a custodial sentence at the high end of that range of 24 months for the reasons set forth below.

**B. Fine and Restitution**

Under Section 2R1.1(c)(1), the fine for an individual is one to five percent of the volume of commerce, but not less than $20,000. U.S.S.G. §2R1.1(c)(1). Here, Galloway's fine would be between $74,489 and $374,493 because his volume of commerce is stipulated to be $7,489,862. Consistent with paragraph 9 of Galloway's plea agreement, the government recommends that the Court impose a fine of $74,899.

---

[1] While minimizing the extent of his supervision of Diaz, Galloway admits that he gave his brother instructions at the foreclosure auctions. *See* PSR ¶ 19.

With respect to restitution, while the Mandatory Victim Restitution Act, 18 U.S.C. § 3663 does not apply, restitution is permitted under 18 U.S.C. §§ 3583(d) (restitution as a discretionary condition of supervised release) and 3663(a)(3) (restitution to extent agreed to by parties in a plea agreement). In this case, the parties agreed to recommend that Galloway pay $256,050 in restitution.

## II. A Sentence of 24 Months Is Reasonable And Appropriate

Galloway's Guidelines assessment, thus, results in a recommended sentence of 18 to 24 months. Probation recommended a substantial variance from the Guidelines: just six months of imprisonment. The government believes that a below-Guideline sentence, let alone one that varies so dramatically, will not serve the factors articulated in section 3553. Galloway was an unabashed and unrepentant leader of the conspiracy who walked away with more than a quarter of a million dollars in payoffs and who even today does not fully take responsibility for his conduct. The government's recommendation of 24 months of imprisonment is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553(a). The most compelling factors weighing in favor of the proposed term of imprisonment are the need to afford adequate deterrence; to avoid an unwarranted sentencing disparity, and for the sentence to reflect the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(2).

### A. A 24-Month Custodial Sentence Is Necessary to Adequately Deter Future Violations of Antitrust Laws

This is a case that calls for specific deterrence. Defendant provided the following statement to the Probation Office about his offense:

> Many people thought we should not bid against each other. We did not know or understand there was something criminally involved. It was a business decision. . . I thought it was a natural and reasonable thing to do.

PSR ¶ 25. The defendant's statement underscores the need for specific deterrence under 18 U.S.C. 3553(a)(2)(C), to protect the public from further crimes that the defendant may commit. While Galloway has accepted responsibility and pleaded guilty, his statement is not supported by his own offense conduct. His statement ignores both his role as a recruiter and his own

consciousness of guilt during the conspiracy. A defendant who justifies his criminal activity as a "business decision" is someone who may not be deterred from making similar illegal decisions in the future without sufficient punishment.

There is a wealth of evidence that suggests that Galloway and the other coconspirators knew that what they were doing was illegal. For example, the conspiring bidders formed their agreements not to compete at the public auction using code words and non-verbal gestures, so as not to attract the attention of the auctioneers and the other bidders. Bond Decl. at ¶¶ 50-51. The members of the conspiracy conducted rounds away from the courthouse steps and suspended the rounds if an outsider happened to walk by. *Id.* at ¶¶ 51, 61. Round payments were supposed to be paid in cash so as not to leave a paper trail. *Id.* at ¶ 53. Numerous witnesses have described their belief that the conspirators knew that what they were doing was wrong or illegal and should be kept secret. *Id.* at ¶¶ 54-56. The evidence suggests that Galloway was well aware of this need for secrecy. In fact, Galloway's coconspirators warned him to be more discreet. *Id.* at ¶ 62. Just recently, in fact, coconspirator Zepernick described how Galloway, when trying to convince him to participate in the rounds, told him it was an opportunity to make money tax-free. *Id.* at ¶ 63. Defendant's argument on the eve of sentencing that he was somehow mistaken about the law is not supported by the evidence. The argument also strains credulity. It is not credible that defendant would think it was a perfectly "normal" business decision to cluster together with a group of insiders and agree to pay each other thousands of dollars in cash after shutting down the bidding at the auction, sometimes by intimidation. This crime, at base, is about cheating to get ahead. Even if he lacked a sophisticated understanding of the antitrust laws, it is not hard to recognize what was going on at the auctions as cheating – and Galloway turned to cheating to pad his bottom line. A sentence below the guidelines would not deter this defendant from future bid-rigging.

Also, Galloway's statement claiming to have been unaware of the illegality of his conduct is just one of many examples of Galloway minimizing his role and involvement in the conspiracy. Galloway also told Probation that he was simply an innocent bystander to the collusion on 70 Holiday Drive in Alamo described above. *See* PSR ¶ 18. Not only does this

explanation defy common sense, it is contradicted by at least *ten* firsthand accounts of the event, including White and Pickett. White and Pickett both recall that far from just inexplicably accepting a $100,000 check, Galloway negotiated the deal and even went to the bank to collect the money. Bond Decl. ¶¶ 40-41. And in fact, the FBI seized notes from this payoff deal from coconspirator Michael Marr's office:




NDRE-MM1-04-00370. These notes clearly show Galloway getting a portion of the payoff -- a larger share than the others because, as Doug Ditmer remembered him explaining, he had to do the "dirty work." *Id*. at ¶ 42.

The PSR has other examples of Galloway minimizing or downplaying his role in the conspiracy. *See, e.g.*, PSR ¶¶ 15 (claiming that he never paid anyone in exchange for not competing); 19 (claiming that he simply gave Diaz "an opportunity" to participate in, and make money from, the foreclosure auctions and that he only sometimes gave Diaz instructions and "suggestions"). Taken together, these statements make clear that Galloway continues to minimize, justify, and misrepresent his conduct.

Apart from specific deterrence, a custodial sentence of 24-months is appropriate as a general deterrent. An important consideration for the Court is whether the punishment will adequately deter future violations of the antitrust laws. *See* 18 U.S.C. § 3553(a)(2)(B) (courts should consider "adequate deterrence to criminal conduct" in selecting a sentence). Indeed, "perhaps paramount among the purposes of punishment is the desire to deter similar misconduct by others." *United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985); *see also Furman v.*

*Georgia*, 408 U.S. 238, 343 (1972) (per curiam) (Marshall, J., concurring) ("Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment."). The need for prison sentences in antitrust crimes is also reflected in the comments to the Guidelines: "It is the intent of the Commission that alternatives such as community confinement *not* be used to avoid imprisonment of antitrust offenders." U.S.S.G. §2R1.1 cmt. n.5 (emphasis added).

The background to the sentencing guideline for bid rigging explains the Commission's intent that individuals who rig bids should ordinarily go to prison:

> [P]rison terms for these offenders should be much more common, and usually somewhat longer, than typical under pre-guidelines practice. Absent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases…in very few cases will the guidelines not require that some confinement be imposed.

*Id.* §2R.1.1, Background. Similarly, the legislative history of the Sentencing Reform Act notes that for white collar crimes, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 98-225, at 91-92 (1983) as reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

A non-custodial sentence will fail to reflect the seriousness of the crime and will inadequately provide deterrence. As the Court is well aware, the bid-rigging conduct in this case was widespread. Dozens of coconspirators carried out the bid-rigging conduct at county courthouses throughout Northern California over a number of years. Incarceration is necessary to serve as a general deterrent to other real-estate investors in California and elsewhere who may be tempted to enrich themselves through similar crimes. And it will promote respect for the law. "To provide for a mere slap on the wrist of those convicted of serious economic crimes, with no or virtually no time imprisoned as punishment, strikes a blow to the integrity of our criminal justice system." *United States v. Ruff*, 535 F.3d 999, 1006 (9th Cir. 2008) (Gould, dissenting). A non-custodial sentence will not serve as a noticeable deterrent for others to commit similar crimes because the risk of such a lenient sentence would be perceived as a minimal cost of doing business in exchange for the potential windfall from ill-gotten financial gains.

**B. A 24-Month Custodial Sentence Is Appropriate Because of the Seriousness of the Crime**

The bid rigging in Contra Costa County was a serious, far-reaching crime. Defendant was a member of a criminal conspiracy that corrupted a fair and competitive process meant to compensate mortgage holders, homeowners, and other beneficiaries following a home foreclosure. The members of the conspiracy exploited that process for their personal enrichment. The total bid-rigging payoff amounts for the 275 properties where the government has found evidence that the defendant suppressed competition was $1,512,253. This money was divided among the conspirators as the fruits of the conspiracy rather than being paid to the beneficiaries. This conduct was especially harmful given its timing during the foreclosure crisis that began in 2008, when housing prices were already depressed and losses from under-water mortgages had skyrocketed. The conspiracy bred distrust in the auction process and discouraged investors outside of the conspiracy from attending the auctions and bidding on properties because of how the insiders demanded payoffs and intimidated newcomers. *See* Bond Decl. ¶¶ 34, 35 39-41.

A sentence of 24 months at the high end of the guidelines–is necessary in order to adequately account for the harm. The Sentencing Commission noted that in some bid-rigging cases, “understatement of seriousness is especially likely.” U.S.S.G. §2R1.1 cmt. n.6.; *id.* cmt. background (“The Commission believes that the volume of commerce is liable to be an understated measure of seriousness in some bid-rigging cases.”). This is because the offense level calculation under Section 2R1.1 is based upon “the volume of commerce done by [the defendant] . . . in goods or services that were affected by the violation.” U.S.S.G. §2R2.1(b)(2). In bid rigging cases like this one therefore, only the winning bidder does any commerce and not those who agreed to stop or refrain from bidding even though they “contributed to harm that possibly was quite substantial.” U.S.S.G. §2R1.1 cmt. n.6. For this reason, the Commission recommends that “[t]he court should consider sentences near the top of the guideline range.” *Id.* cmt. n.6.

In this case, the volume-of-commerce calculation only includes the properties won in the rounds. That is just 55 of the 275 properties Galloway helped rig, and none of the properties where he received an illegal payoff. Put another way, Galloway’s volume of commerce accounts

for just 20% of the harm he helped cause. Therefore, the great majority of defendant's criminal conduct is not reflected in the volume-of-commerce figure underlying the Guidelines calculation. For this reason, a sentence within the Guidelines is imperative and a sentence near the top of the Guidelines is warranted.

### C. A 24-Month Custodial Sentence Is Necessary to Avoid Unwarranted Sentencing Disparity

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants within similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). On March 8, 2017, the Court sentenced codefendant Nicholas Diaz, Galloway's brother and employee, to six months of imprisonment. The government's proposed sentence of 24 months is necessary to reflect the stark difference in relative culpability between Galloway and Diaz. Diaz was involved in 26 properties, Galloway 275. Galloway's volume of commerce is more than 15 times greater than Diaz's. Even setting aside the transactions that Diaz participated in, Galloway participated in ten times more rigged auctions than Diaz. Moreover, Diaz was not the one who profited from this scheme. This was Galloway's business, Galloway stood to gain, and it was Galloway who directed Diaz to participate. For this reason alone, the Court should reject Probation's recommendation of six months of incarceration. The government's recommendation of 24 months adequately reflects the greater and more egregious role Galloway played in the conspiracy.

## III. There Is No Basis to Vary from the Guidelines

Probation recommends a dramatic variance from Galloway's Guideline calculations, reducing Galloway's term of incarceration by more than half. As justification, Probation cites defendant's "lack of criminal history and contact with law enforcement; his family and community involvement; aberrant behavior in his usually law abiding life; age at the time of the instant offense; and collateral consequences of his criminal conduct" as factors that warrant a variance. The government respectfully disagrees.

First, as discussed above, it is simply not credible that defendant believed he was making a legitimate business decision to participate in this conspiracy. But, in any event, such a belief

does not warrant a variance given Galloway's egregious conduct, doing everything he could to shut down the competitive bidding process on hundreds of properties, bringing his brother into the conspiracy, and bragging about and raking in illegal payoffs. Nor do the "collateral consequences" warrant a variance. Under Section 3553(a)(2)(A), the *sentence* imposed should reflect the seriousness of the crime. Collateral consequences of the *charges* are not relevant. *See United States v. Musgrave*, 761 F.3d 602, 608-609 (6th Cir. 2014) (finding that the district court's reliance on the fact that the defendant had been "punished extraordinarily" by "four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life" was improper) (internal quotations and citations omitted). This kind of argument is also unfair to less fortunate criminal defendants who, for example, do not hold professional licenses and cannot argue that they should avoid imprisonment because of "collateral consequences."

Nor should Galloway's "family and community involvement" warrant such a drastic variance. Galloway, like all the defendants in this case, was charged on the basis of what he did not who he is. And, unlike some defendants, Galloway made a conscious choice to conduct his business in an illegal manner. He, unlike some defendants in this case, was not simply following the direction of his employer and passing the proceeds onto his boss. Galloway's family and community involvement is not unique, nor does his community involvement appear unusually extensive. These characteristics and histories are shared by most white-collar defendants. They provide no reason to depart downward from the Guideline sentences because the antitrust guideline accounts for such a typical offender. *See United States v. Carter*, 560 F.3d 1107, 1121-22 (9th Cir.2009) (observing that a defendant's prior history and circumstances were not so "atypical as to put [the defendant] outside the 'minerun of roughly similar' cases considered by the Sentencing Commission in formulating the Guidelines")(citation omitted); *see also* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.") Finally, the fact that Galloway has had no prior criminal history is already taken into account in his Criminal History Category.

There is no basis under Section 3553 to vary from the Guidelines sentence of 18 to 24 months. Galloway was one of the most notorious and aggressive conspirators in Contra Costa. He was responsible for bringing in several of the coconspirators and he also took it upon himself to enforce the rules of the conspiracy and bring his brother into the criminal scheme. In short, Galloway was instrumental to the success and proliferation of the Contra Costa conspiracy. He embraced his role and relished the power he exercised in the course of corrupting the auctions for hundreds of homes. His sentence should reflect that.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court sentence defendant John Michael Galloway to (1) serve 24 months in custody, (2) serve three years of supervised release, (3) a fine of $74,899, and (4) pay restitution in the amount of $256,050, and (5) pay a $100 special assessment.

Dated: March 8, 2017

Respectfully submitted,

/s/

MICAH L. RUBBO
United States Department of Justice
Antitrust Division